Yvonne A. ALEXIS, et al.,
Plaintiffs, Appellants,

v.

McDONALD'S RESTAURANTS OF MASSACHUSETTS, INC., Michael Leporati and Donna Domina, Defendants, Appellees.

No. 94–1554.

United States Court of Appeals,
First Circuit.

Heard Nov. 7, 1994.

Decided Oct. 10, 1995.

Terance P. Perry, with whom Brendan J. Perry and Christopher M. Perry were on brief, Holliston, MA, for appellants.

Philip B. Benjamin, with whom Aaron K. Bikofsky was on brief, Framingham, MA, for appellee Michael Leporati.

John P. Noyes, with whom John A. Kiernan and Gilberg, Kurent & Kiernan, were on brief, Boston, MA, for appellees.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

Plaintiffs Yvonne Alexis ("Alexis"), and family members, challenge a summary judgment order rejecting various federal civil rights claims and related state-law claims stemming from the treatment accorded Alexis at a restaurant owned and operated by defendant-appellee McDonald's Restaurants of Massachusetts, Inc. We affirm, in part, and remand other claims for further proceedings.

## I

### BACKGROUND [1]

At approximately 10:00 p.m. on July 20, 1990, in Framingham, Massachusetts, Alexis and her family, who are African Americans, entered a McDonald's restaurant, proceeded to the service counter, placed their order, and paid in advance. When the food was placed before them at the service counter, it became apparent that Alfredo Pascacio, whose native tongue is Spanish, had mistaken their order. During the ensuing exchange between Alexis and Pascacio, defendant-appellee Donna Domina, the "swing manager," intervened in behalf of Pascacio, which prompted Alexis to say: "[Y]ou take care of the people in front of you. He's taking care of me, and we're sorting this out." Domina nonetheless persisted for several more minutes.

Ultimately, Domina said to Alexis, "I don't have to listen to you." Alexis replied,

"[Y]ou're damn right you don't have to listen to me. I was not speaking to you. I was speaking to him." Domina then instructed Pascacio: "Just put their stuff in a bag and get them out of here." Turning to Alexis, Domina retorted: "You're not eating here. If you [do] we're going to call the cops." Alexis responded: "Well you do what you have to do because we plan to eat here." Notwithstanding Domina's instructions, Pascacio placed the food order on a service tray, without bagging it. The entire incident at the service counter had lasted approximately ten minutes.

After the Alexis family went into the dining area, Sherry Topham, a managerial employee, summoned defendant Michael Leporati into the restaurant. Leporati, a uniformed off-duty police sergeant, had been patrolling on foot outside the restaurant by prearrangement with the Town of Framingham, but had witnessed no part of the earlier exchange among Alexis, Pascacio and Domina.

Upon entering the restaurant, Leporati was informed by Domina that Alexis had been yelling, creating a "scene" and an "unwarranted disturbance" over a mistaken food order, and directing abusive remarks at Pascacio.[2] Domina informed Leporati that Alexis had argued loudly with her and another employee; that she "just wasn't stopping"; and that Alexis was still in the dining area though Domina had "asked her to leave." Finally, Domina told Leporati, "I would like *her* to leave."

Without further inquiry into the "disturbance" allegedly caused by Alexis, Leporati proceeded to the dining area where Alexis and her family were seated, and informed the entire Alexis family that the manager wanted them to leave and that they would have to go. Alexis immediately asked why, denied causing any disturbance, and claimed a right to finish eating in the restaurant. When she urged Leporati to ask other restaurant cus-

---

1. The material facts in genuine dispute are related in the light most favorable to plaintiffs-appellants, against whom summary judgment was entered. *See Velez–Gomez v. SMA Life Assur. Co.,* 8 F.3d 873, 874 (1st Cir.1993).

2. At summary judgment, we must credit Alexis's statement that she did not yell or cause a "disturbance." *See supra* note 1. But since it is uncontradicted, we must also assume that Domina *informed* Leporati that Alexis had caused a disturbance. *Id.*

tomers whether there had been any disturbance, Leporati simply reiterated that the family would have to leave, then returned to the service counter.[3]

At the service counter, Leporati relayed his conversation with Alexis and informed Domina that the Alexis family had refused to leave. In Leporati's presence, Domina discussed the matter with Sherry Topham, who recalled having had a "problem" with Alexis on a prior occasion.[4] At that point, Domina stated, "Well, if that's the case, then maybe we should have her leave." With that, Sergeant Leporati returned to the Alexis family and advised *Alexis* that *she* would be arrested unless she left before his backup arrived. *Cf. supra* note 3. Alexis reiterated that she believed she had the right to finish eating. Leporati left the dining area to call for backup.

Approximately ten minutes later, Officer William Fuer arrived and Alexis was told by Leporati that she was being placed under arrest. Then, without asking or directing Alexis to get up from the table, Leporati suddenly and violently grabbed and pulled her bodily from the booth and across the table, handcuffed her hands tightly behind her back, and, with the help of Officer Fuer, dragged her from the booth, bruising her legs in the process. Insisting that she was "not resisting arrest," Alexis asked the officers to allow her to walk out. Instead, they hoisted her by her elbows and carried her from the restaurant to the police car, where Leporati pushed her into the car with the instruction, "Get your ass in there."

As she was being removed from the restaurant, Alexis and her husband repeatedly asked the officers why she was being treated in this manner. When Mr. Alexis said, "We have rights," Leporati responded, "You people have no rights. You better shut up your [expletive] mouth before I arrest you too."

Alexis eventually was charged with criminal trespass, a misdemeanor under Mass. Gen.Laws Ann. ch. 266, § 120 (West 1994). Following her acquittal by a jury, Alexis and her family filed the present action in the United States District Court for the District of Massachusetts, asserting civil rights claims under 42 U.S.C. §§ 1981, 1983, & 1985(3), as well as state law claims for use of excessive force, intentional infliction of emotional distress, assault, battery, false imprisonment, malicious prosecution, and abuse of process. The district court granted summary judgment for the defendants on all federal claims and on the excessive force claim against Leporati under Mass.Gen.Laws Ann. ch. 12, § 11I. Finally, the court granted summary judgment for all defendants on the remaining state law claims, without stating its grounds. Plaintiffs appealed.

## II

### *DISCUSSION*

■ A grant of summary judgment is reviewed *de novo* under the same criteria incumbent upon the district court; it cannot stand on appeal unless the record discloses no trialworthy issue of material fact and the moving party is entitled to judgment as a matter of law. *Guzman–Rivera v. Rivera–Cruz*, 29 F.3d 3, 4 (1st Cir.1994).

### A. *Section 1981*

■ Section 1981 proscribes intentional discrimination based on race. *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982); *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 17 (1st Cir.1989). The district court found no competent evidence of intentional race-based discrimination. Alexis presses her section 1981 claims against Domina and McDonald's on the theory that her race-based exclusion from the dining area violated her right to make and enforce contracts. *See* 42 U.S.C. § 1981(a).[5] As to de-

---

**3.** The record is silent as to why all Alexis family members were ordered to leave, though only Alexis had been involved in the exchange at the service counter.

**4.** The record reflects no other information concerning the timing or nature of any such "prob-

lem." As Alexis attests that there had been no prior incident, we are required to assume as much.

**5.** Section 1981(a) provides in its entirety:

All persons within the jurisdiction of the United States shall have the same right in every

fendant Leporati, she alleges that her race-based arrest deprived her of the right to "full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens," *id.* § 1981(a), and to "like punishment, pains, penalties ... of every kind, and *to no other.*" *Id.* (emphasis added).

### 1. *Domina and McDonald's*

The district court initially excluded, as incompetent, *see* Fed.R.Civ.P. 56(e) (affidavits may be considered at summary judgment only if facts attested to are based on admissible evidence); Fed.R.Evid. 701, portions of the deposition testimony of six witnesses—the five Alexis family members and Karen Stauffer, an eyewitness to the events—each of whom opined, in effect, that had Alexis been "a rich white woman," she would not have been treated in the same manner. The court found that the proffered testimony was "not supported by sufficient factual undergirding" to permit a reasonable inference that either Domina or McDonald's discriminated against Alexis on the basis of her race. The court nonetheless allowed Alexis further time to submit supplemental affidavits setting forth more particular grounds for the conclusory deposition testimony relating to racial animus. Alexis failed to do so.

Opinion testimony from lay witnesses is admissible only if it is "rationally based on the perception of the witness and ... helpful to a clear understanding of the witness' testimony or the determination of the fact in issue." Fed.R.Evid. 701; *see Swajian v. General Motors Corp.,* 916 F.2d 31, 36 (1st Cir.1990). Rulings on the admissibility of lay opinion testimony are reviewed only for "manifest abuse of discretion." *United States v. Jackman,* 48 F.3d 1, 4 (1st Cir.1995) (citing *Keller v. United States,* 38 F.3d 16, 31 (1st Cir.1994)). The exclusionary ruling was well within the district court's broad discretion.

The six deponents based their inferences of racial animus on their personal observations that Domina reacted "angrily" toward Alexis and with "a negative tone in her voice," was "unfriendly," "uncooperative," "high strung," "impolite," "impatient," and had "no reason" to eject Alexis. Although these observations may be entirely compatible with a race-based animus, there simply is no foundation for an inference that Domina harbored a racial animus toward Alexis or anyone else, absent some probative evidence that Domina's petulance stemmed from something other than a race-neutral reaction to the stressful encounter plainly evidenced in the summary judgment record, including Alexis's persistence (however justified). As the depositions disclosed no evidentiary foundation for an inference of *racial* animus, the conclusory lay opinions were properly excluded. *See* Fed.R.Evid. 701(a); Fed.R.Civ.P. 56(a); *Willco Kuwait (Trading) S.A.K. v. deSavary,* 843 F.2d 618, 624 (1st Cir.1988) (lay opinion testimony, which does little more than tell the jury what result to reach, should not be admitted); *see also Connell v. Bank of Boston,* 924 F.2d 1169, 1177–78 (1st Cir.) (lay opinion—that employer was " 'determined to eliminate ... senior employees' "—pointed to no specific facts sufficient to buttress such a "broad assertion") (ADEA claim), *cert. denied,* 501 U.S. 1218, 111 S.Ct. 2828, 115 L.Ed.2d 997 (1991); *cf. Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1544 (10th Cir. 1995) (determining inadmissible the lay opinion of co-worker that sexual harassment defendant had " 'a problem with women who were not between the ages of 19 and 25 and who weighed more than 115 pounds' "); *Coca-Cola Co. v. Overland, Inc.,* 692 F.2d 1250, 1254–55 (9th Cir.1982) (upholding exclusion of lay opinion testimony by bar and restaurant employees that customers used term "Coke" in generic sense).

As Alexis points to no competent evidence that Domina and McDonald's intentionally discriminated against her on account of her race, the district court correctly ruled that this section 1981 claim was not trialworthy. *See Dartmouth Review,* 889 F.2d at 18

---

State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

("'Disputes generally arise out of mutual misunderstanding, misinterpretation and overreaction, and without more, such disputes do not give rise to an inference of discrimination.'") (quoting *Johnson v. Legal Servs. of Ark., Inc.*, 813 F.2d 893, 896 (8th Cir.1987)). Accordingly, the summary judgment entered in favor of Domina and McDonald's must be affirmed.

### 2. *Leporati*

All courts of appeals which have considered the question have held that a misuse of governmental power motivated by racial animus comes squarely within the "equal benefit" and "like punishment" clauses of section 1981(a). *See Mahone v. Waddle*, 564 F.2d 1018, 1027–30 (3d Cir.1977) (false arrest), *cert. denied*, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978); *see also Evans v. McKay*, 869 F.2d 1341, 1344–45 (9th Cir. 1989) (reversing dismissal of section 1981 claim alleging that police officers and others instigated "racially-motivated arrest-boycott conspiracy"); *Coleman v. Franklin Parish Sch. Bd.*, 702 F.2d 74, 76–77 (5th Cir.1983) (remanding for factfinding on section 1981 claim that school officials denied black pupil equal benefit of laws and proceedings relating to corporal punishment). We have been presented with no basis in law or reason for departing from this solid line of authority.

■ During the arrest, Sergeant Leporati stated to Mr. Alexis: "You people have no rights. You better shut up your ... mouth before I arrest you too." Alexis insists that this statement betrayed a racial animus. Leporati responds that the statement—"You people have no rights"—is too general to support the section 1981(a) claim. Given its context, we cannot agree.

A rational factfinder who credited this statement, as we must at summary judgment, *see supra* note 1, reasonably could infer that Leporati harbored a racial animus adequate to support a section 1981 claim, especially since the record reflects that the *only* relevant behavior or physical characteristic—both *apparent* to Leporati and *shared* by the Alexis family—was their black skin. Indeed, a rational factfinder would be hard-pressed to glean a more plausible inference, particularly since Leporati has tendered no alternative interpretation supported by the present record.[6] Viewed in context, therefore, the Leporati statement, tarring the entire family with the same brush—absent a scintilla of evidence that any member, with the possible exception of Alexis, had said or done anything remotely wrong or disorderly—cannot reasonably be *presumed so innocent as to preclude* a discriminatory animus.

■ Accordingly, we hold that the evidence adduced at summary judgment, viewed in context, was sufficient to support a reasonable inference that Leporati not only gratuitously employed excessive force in arresting Alexis but that his actions were motivated by a racial animus violative of the "equal benefit" and "like punishment" clauses of section 1981(a). Thus, Alexis raised a trial-worthy issue under section 1981 as to whether Leporati deprived her of "the full and equal benefit" of the law accorded white persons and the right to "like punishment ... [and] no other." 42 U.S.C. § 1981(a).[7]

---

6. The only alternative interpretation advanced by Leporati is that "there are objective undisputed facts which are contrary to plaintiffs' premise (i.e. that four black people were not ordered to leave and were not arrested)." The undisputed facts flatly contradict a material portion of Leporati's parenthetical assertion, however. When Leporati first confronted them in the dining area, he ordered the *entire* Alexis family to leave. *See supra* p. 345–46. After returning to the service counter to inform Domina of their refusal to leave, and upon learning that Topham recalled a "problem" with Alexis in the past, Leporati returned to the table and announced his intention to arrest only Alexis. Given his decision to arrest only Alexis, Leporati's retort, "You people have no rights," accompanied by the subsequent threat to arrest Mr. Alexis, remains unexplained by any argumentation presented on appeal.

7. Of course, qualified immunity may be available to a police defendant in a § 1981 action. *See Ricci v. Key Bancshares of Maine, Inc.*, 768 F.2d 456, 467 (1st Cir.1985) (FBI agents entitled to qualified immunity in § 1981(a) action); *see also Wicks v. Mississippi St. Employment Servs.*, 41 F.3d 991, 996 n. 21 (5th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2555, 132 L.Ed.2d 809 (1995); *Gallegos v. Denver*, 984 F.2d 358, 364 (10th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 2962, 125 L.Ed.2d 662 (1993); *Johnson v. Estate of Laccheo*, 935 F.2d 109, 112 (6th Cir.1991); *cf. Yerardi's Moody St. Restaurant & Lounge, Inc. v. Board of Selectmen*, 878 F.2d 16, 19–21 (1st Cir.1989) (recognizing qualified immunity de-

**B. Section 1985(3)**

 Alexis alleged that Leporati and Domina "directly and explicitly conspired to deprive [her] of the equal protection, equal privileges and equal rights guaranteed to her under the Constitution and the laws of the United States" in violation of 42 U.S.C. § 1985(3). A trialworthy section 1985(3) conspiracy claim requires competent evidence that " 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus' " motivated the alleged conspirators. *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, ——, 113 S.Ct. 753, 758, 122 L.Ed.2d 34 (1993) (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971)). Alexis predicated her section 1985(3) conspiracy claim on Sergeant Leporati's statement: "You people have no rights." Although this evidence, viewed in context, is sufficient to enable a reasonable inference that Leporati harbored the requisite racial animus, *see supra* Section II.A.2, there is no evidence which would support such an inference as to Domina.

**C. Section 1983**

The gravamen of these federal claims is that Sergeant Leporati, acting under color of Massachusetts law, deprived Alexis of her Fourth Amendment right to be free from unreasonable seizure of her person in effecting her misdemeanor arrest with excessive force, without a warrant and without probable cause. She also claims that Domina deprived her of procedural due process by summoning Leporati into the restaurant and directing her removal under color of state law. Finally, she alleges that Leporati determined to arrest her, and effected her arrest, in a discriminatory manner, based on her race and in violation of the Equal Protection Clause of the Fourteenth Amendment.

**1. Arrest Without Probable Cause**

**a. Leporati**

 The Fourth Amendment guaranty against unreasonable seizures of the person requires that arrests be based on probable cause. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225–26, 13 L.Ed.2d 142 (1964); *Santiago v. Fenton,* 891 F.2d 373, 383 (1st Cir.1989). The "probable cause" analysis entails " 'an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time' and not [an assessment of] the officer's state of mind at the time the challenged action was taken." *Maryland v. Macon,* 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1985) (quoting *Scott v. United States,* 436 U.S. 128, 136, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978)). Probable cause will be found if "the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense." *Rivera v. Murphy,* 979 F.2d 259, 263 (1st Cir.1992).

**i. Revocation of Invitation**

██ Although appellants argue that the district court erred in finding probable cause for Alexis's arrest, we perceive no error. As previously noted, Alexis was arrested for criminal trespass, a misdemeanor under the applicable Massachusetts statute:

> Whoever, *without right enters or remains* in or upon the ... buildings ... of another, after having been forbidden so to do by the person who has lawful control of said premises ... shall be punished by a fine of not more than one hundred dollars or by imprisonment for not more than thirty

fense to § 1983 equal protection claim analogous to "equal benefit" claim in instant case). Nevertheless, qualified immunity does "not bar inquiry into a defendant's state of mind when the applicable law makes the defendant's state of mind (as distinct from defendant's *knowledge* of the law) an essential element of plaintiff's constitutional claim." *Feliciano–Angulo v. Rivera–Cruz,* 858 F.2d 40, 46 (1st Cir.1988); *see also Tompkins v. Vickers,* 26 F.3d 603, 607 (5th Cir.1994) (noting that every circuit to consider the question has

concluded that "a public official's motive or intent must be considered in the qualified immunity analysis where unlawful motivation or intent is a critical element of the alleged constitutional violation") (collecting cases). Thus, whether Leporati violated Alexis's civil rights under § 1981(a) turns on a material issue of fact in genuine dispute, which precluded summary judgment. *See Feliciano–Angulo,* 858 F.2d at 47; *see also Johnson v. Jones,* —— U.S. ——, ——, 115 S.Ct. 2151, 2158, 132 L.Ed.2d 238 (1995).

days or both such fine and imprisonment.... A person who is found committing such trespass *may be arrested* by a ... police officer and kept in custody in a convenient place, not more than twenty-four hours, Sunday excepted, until a complaint can be made against him for the offence, and he be taken upon a warrant issued upon such complaint.

Mass.Gen.Laws Ann. ch. 266, § 120 (emphasis added). Thus, under chapter 266, section 120, a person who *remains,* without right, on the property of another commits a continuing misdemeanor for which she may be subjected to a warrantless arrest by a police officer provided there is probable cause. *Id.*

The undisputed facts demonstrate that Domina expressly directed Alexis to leave the restaurant, but that Alexis nevertheless refused to leave until she and her family had finished eating. Appellants cite no authority for their implicit suggestion that Massachusetts recognizes an exception to the seemingly absolute right of a private business owner to withdraw, without cause, its implied license to enter a business establishment. *Cf. State v. Tauvar,* 461 A.2d 1065, 1067 (Me. 1983) (Maine trespass statute permits revocation of implied invitation *only* where business owner "has some justification for requesting removal"); Model Penal Code § 221.2(3)(b) (affirmative defense to criminal trespass requires evidence that "premises ... open to members of the public and [defendant] complied with all lawful conditions imposed on access to or remaining in the premises"). Moreover, we have combed Massachusetts law for such an exception, to no avail.

It has been held, of course, and we do not question, that a Massachusetts business property owner may not violate the constitutional or statutory rights of its business licensees under the shield of the Massachusetts trespass statute. *See Hurley v. Hinckley,* 304 F.Supp. 704, 710 (D.Mass.1969) ("The words 'without right' in the context of the historical concept of trespass can only mean: [']without any legal right; without any right, permission or license recognized by law as permitting an entry into the area described in the statute.['] ... The concept [of] legal right in the context of today's constitutional developments includes any right of the plaintiffs, individually or collectively, found in the Constitution of the United States...."), *aff'd mem.,* 396 U.S. 277, 90 S.Ct. 603, 24 L.Ed.2d 469 (1970); *Smith v. Suburban Restaurants, Inc.,* 374 Mass. 528, 373 N.E.2d 215, 218 (1978) (noting in libel case that "[a] place of public accommodation, as members of the community might know, has an obligation to treat each member of the public equally, except for good cause") (dicta) (citations omitted); *Commonwealth v. Lapon,* 28 Mass. App.Ct. 681, 554 N.E.2d 1225, 1227 (1990) (the term "without right" encompasses constitutional rights).

 Nevertheless, the Massachusetts trespass statute does not limit the power of a Massachusetts business owner *summarily* to revoke a business licensee's right to enter or remain upon business premises held open to the general public. *See Stager v. G.E. Lothrop Theatres Co.,* 291 Mass. 464, 197 N.E. 86, 87 (1935) (finding that, "[g]enerally speaking," a theater owner has an absolute right to revoke theater-goer's license to enter or remain on the premises); *cf. Baseball Publishing Co. v. Bruton,* 302 Mass. 54, 18 N.E.2d 362, 363 (1938) ("[I]t is of the essence of a license [to enter private property] that it is revocable at the will of the possessor of the land.... The revocation of a license may constitute a breach of contract, and give rise to an action for damages. But it is none the less effective to· deprive the licensee of all justification for entering or remaining upon the land."); *Commonwealth v. Hood,* 389 Mass. 581, 452 N.E.2d 188, 194 (1983) (stating that Massachusetts trespass statute " 'protect[s] the rights of those in lawful control of property to forbid entrance by those whom they are unwilling to receive, and to exclude them if, having entered, those in control see fit to command them to leave' ") (quoting *Commonwealth v. Richardson,* 313 Mass. 632, 48 N.E.2d 678, 682 (1943)); *see also State v. Bowman,* 124 Idaho 936, 866 P.2d 193, 202 (Ct.App.1993) (in case involving business invitees who purchased movie theater tickets, holding that Idaho trespass statute "does not require that the owner[s] of private property have any reason for asking

trespassers to get off their land"); *Impastato v. Hellman Enters., Inc.*, 147 A.D.2d 788, 537 N.Y.S.2d 659, 661 (1989) (same). Absent some invidious ulterior purpose, therefore, once proper notice has been given by the owner, and the business licensee nonetheless remains on the property, the Massachusetts trespass statute permits arrest of the uncooperative trespasser. *See Hood*, 452 N.E.2d at 194.

■■■ Although the Massachusetts trespass statute does *not* enable business owners to exclude business licensees on discriminatory grounds, *Hurley*, 304 F.Supp. at 710, Alexis proffered no competent evidence that Domina or McDonald's, as distinguished from Leporati, sought to exclude her on the basis of her race. *See supra* Section II.A.1. Thus, on the record evidence, Domina acted within her lawful authority—as "the person [having] lawful control of said premises," Mass.Gen.Laws Ann. ch. 266, § 120—in revoking Alexis's implied license to utilize McDonald's dining facilities.

## ii. *Probable Cause*

■ Probable cause exists if "the facts and circumstances within [a police officer's] knowledge and of which [the officer] had reasonably trustworthy information [are] sufficient in themselves to warrant a [person] of reasonable caution" to believe that a crime has been committed or is being committed. *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925); *United States v. Drake*, 673 F.2d 15, 17 (1st Cir.1982). Leporati effected this arrest based on the eyewitness report from Domina that Alexis had created an "unwarranted disturbance" and refused to leave the premises, and on the representation by Sherry Topham that there had been an unspecified "problem" with Alexis in the past. An objectively reasonable police officer so informed by the person in charge of the business premises, *see supra* note 2, fairly could conclude that the implied license extended to Alexis had been revoked and that there was probable cause to believe that her continued presence constituted a criminal trespass. *See* Mass. Gen.Laws Ann. ch. 266, § 120 ("A person ... found committing such trespass may be ar-

rested by a ... police officer...."); *see also United States v. Figueroa*, 818 F.2d 1020, 1023 (1st Cir.1987) ("The constitutionality of a warrantless arrest 'depends ... upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'") (quoting *Beck*, 379 U.S. at 91, 85 S.Ct. at 225). Accordingly, we discern no error in the district court ruling that appellants failed to establish a trialworthy dispute on the issue of probable cause to arrest.

### b. *Domina*

■ A section 1983 claim does not lie absent state action. *Casa Marie, Inc. v. Superior Court of P.R.*, 988 F.2d 252, 258 (1st Cir.1993); 42 U.S.C. § 1983 (providing remedy for deprivations "under color of any statute, ordinance, regulation, custom, or usage" of any state or territory). There are two components to the "state action" requirement. First, the deprivation must be shown to have been caused by the exercise of some right or privilege created by the state, or by a rule of conduct imposed by the state, or by a person for whom the state is responsible. *Casa Marie*, 988 F.2d at 258. Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. *Id.* Where a private individual is a defendant in a section 1983 action, there must be a showing that the private party and the state actor jointly deprived plaintiff of her civil rights. *Wagenmann v. Adams*, 829 F.2d 196, 209 (1st Cir.1987); *Casa Marie*, 988 F.2d at 258–59; *see also Dennis v. Sparks*, 449 U.S. 24, 27–28, 101 S.Ct. 183, 186–187, 66 L.Ed.2d 185 (1980) ("Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 actions.").

■ There was no evidence of joint discriminatory action between Leporati and Domina—whether by plan, prearrangement, conspiracy, custom, or policy—which would enable a rational factfinder to conclude that

Alexis's arrest resulted from concerted action tantamount to substituting the judgment of a private party for that of the police or allowing the private party to exercise state power. *Compare Wagenmann*, 829 F.2d at 209–11 (close relationship between private citizen and deputy police chief, together with evidence that private actor and police collectively determined to arrest plaintiff, raised inference that private actor was more than "mere complainant" and that a "meeting of the minds" occurred between police and private defendant sufficient to warrant finding that defendant was state actor) *with Carey v. Continental Airlines, Inc.*, 823 F.2d 1402, 1404 (10th Cir.1987) (airline employee, who complained of striking airline pilot's presence in airport terminal and refusal to leave, found not to be state actor where police officer summoned to airport terminal asked pilot to leave and, upon pilot's refusal, called for three additional officers who escorted pilot to airport security station where he was arrested); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605–06, 26 L.Ed.2d 142 (1970) (holding that white schoolteacher, in company of six black youths denied service at lunch counter, would be entitled to relief under section 1983 *upon proof that lunch counter employee and policeman had reached an understanding* to deny service to teacher because she was a white person in company of blacks). As there is no evidence in the summary judgment record from which it could fairly be inferred that Domina and Leporati had any understanding, tacit or explicit, to deprive Alexis of any right secured by the Constitution or laws of the United States, we conclude that the district court correctly granted summary judgment for Domina on this section 1983 claim.[8]

### 2. *Excessive Force*

Alexis asserts an "excessive force" claim under the Fourth Amendment, which guarantees citizens the right "to be secure in their persons ... against unreason-

able ... seizures." *See Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) ("Where [an] excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment...."). In the Fourth Amendment setting, a viable excessive force claim must demonstrate that the police defendant's actions were not objectively reasonable, viewed in light of the facts and circumstances confronting him and without regard to his underlying intent or motivation. *Id.* at 397, 109 S.Ct. at 1872 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.") (citations omitted).[9]

As the Supreme Court has counseled, our inquiry must be undertaken from the perspective of "a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396, 109 S.Ct. at 1872 (citations omitted). Though the reasonableness test under the Fourth Amendment " 'is not capable of precise definition or mechanical application,' " *id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979)), " '[n]ot every push or shove' " will reach the level required for an actionable "excessive force" claim. *Id.* (citation omitted); *Gaudreault v. Salem*, 923 F.2d 203, 205 (1st Cir.1990) ("[P]olice officers making arrests are often forced to make split-second decisions about the amount of force needed to effect an arrest while operating under tense, dangerous and rapidly-changing circumstances."), *cert. denied*, 500 U.S. 956, 111 S.Ct. 2266, 114 L.Ed.2d 718 (1991). Accordingly, *Graham* prescribes three criteria for evaluating the objective reasonableness of the force used: (1) "the severity of the crime at issue;" (2) "whether the suspect poses an immediate threat to the safety of the officers or others;" and (3)

---

8. Alexis asserts no section 1983 claim against McDonald's.

9. Of course, if evidence of racial discrimination were presented at trial, it would be for the fact-

finder—in assessing the officer's credibility—to determine whether the officer harbored ill will toward the plaintiff. *Graham*, 490 U.S. at 399 n. 12, 109 S.Ct. at 1873 n. 12.

"whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872; *see also Gaudreault*, 923 F.2d at 205.

All three *Graham* factors, viewed in the context of "the totality of the circumstances," *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872; *see also supra* p. 346, weigh heavily in favor of Alexis. First, the crime for which she was arrested—criminal trespass—is a misdemeanor. *See* Mass.Gen.Laws Ann. ch. 266, § 120 (maximum term 30 days). Second, there is no suggestion that Alexis posed a threat to the peace or safety of anyone, including Sergeant Leporati and Officer Fuer. Third, taking her evidence at face value, Alexis neither threatened nor attempted to evade or resist arrest. Nor did any Alexis family member pose a threat to the officers or anyone else. Yet, without even having been requested or directed to get up from the table—and though all the surrounding circumstances, individually and in combination, plainly counseled minimal force in effecting any arrest—Alexis was abruptly pulled from the booth, and across the table, with sufficient force to bruise her legs, then handcuffed with her hands behind her back and dragged and carried to a police cruiser and pushed inside.

▮▮▮▮ Viewed in context and accepted as true, we are not persuaded that the record evidence compelled the conclusion that the force with which Leporati effected the sudden, unannounced, violent seizure and removal of Alexis's person was objectively reasonable, especially since there is no evidence or suggestion that she posed a risk of flight, attempted to resist or evade arrest, or threatened the peace, property or safety of

anyone.[10] *See Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir.1993) (finding trialworthy "excessive force" claim where deputy sheriff arrested, tightly handcuffed, and bruised sixty-seven-year-old man with impaired mobility who attempted to return to his car to sit down while answering officer's questions); *see also Rowland v. Perry*, 41 F.3d 167, 171–74 (4th Cir.1994) (finding trialworthy "excessive force" claim where police officer injured arrestee's leg ("wrenching the knee until it cracked") after arrestee picked up five dollar bill dropped by its owner); *cf. Lester v. Chicago*, 830 F.2d 706, 714 (7th Cir.1987) (pre-*Graham* case) (holding that plaintiff stated trialworthy Fourth Amendment "excessive force" claim when, during course of arrest for disturbing peace, plaintiff was kneed in the back, threatened with being struck, dragged down a hallway, and handcuffed tightly, causing bruises on her wrists); *Patzner v. Burkett*, 779 F.2d 1363, 1371 (8th Cir.1985) (pre-*Graham* case) (finding trialworthy "excessive force" claim where uncooperative double amputee—arrested at home after allegedly driving under the influence—was pulled from wheelchair to floor, then dragged through home after promising to cooperate).[11] Accordingly, the "excessive force" claim must be remanded for further proceedings.[12]

### 3. *Equal Protection*

Alexis claims that Leporati discriminated against her on the basis of her race, both in deciding to enforce the criminal trespass statute by effecting her *immediate arrest*, and by employing unreasonable force. Even assuming probable cause to arrest, she argues that Leporati would not have effected an immediate seizure of her person for so

**10.** The district court did not discuss qualified immunity in relation to the "excessive force" claim. Nor do we, as any such defense is for the district court in the first instance.

**11.** Contrary to Leporati's suggestion, a trialworthy "excessive force" claim is not precluded merely because only minor injuries were inflicted by the seizure. *See Lester*, 830 F.2d at 714 (finding reversible error in district court "excessive force" instruction which required jury to find "severe injury," thus may have led jury to find for defendant where plaintiff's physical injuries

consisted only of bruises); *see also Harper v. Harris County*, 21 F.3d 597, 600 (5th Cir.1994) (holding that plaintiff need not prove "significant injury" to assert Fourth Amendment "excessive force" claim).

**12.** We likewise remand for further proceedings the "excessive force" claim under Mass.Gen. Laws Ann. ch. 12, § 11I, upon which the district court granted summary judgment on the identical grounds relied on for the section 1983 "excessive force" claim.

minor an infraction, nor used such excessive force, were it not for the color of her skin.

In order to avoid summary judgment on her Equal Protection Clause claim, Alexis had to tender competent evidence that a state actor intentionally discriminated against her because she belonged to a protected class. *Johnson v. Morel*, 876 F.2d 477, 479 (5th Cir.1989) (citing *Washington v. Davis*, 426 U.S. 229, 247–48, 96 S.Ct. 2040, 2051–52, 48 L.Ed.2d 597 (1976)), *overruled on other grounds, Harper v. Harris County*, 21 F.3d 597, 600 (5th Cir.1994). This she did. *See supra* Section II.A.2. A rational factfinder, who credited Alexis's evidence of racial animus and excessive force, could conclude that Leporati resolved, on the basis of her race, to enforce the criminal trespass statute by effecting an immediate seizure of her person. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1073, 30 L.Ed. 220 (1886) ("[I]f [the law] is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution."); *Johnson*, 876 F.2d at 479 (plaintiff stated viable Equal Protection Clause claim, where officer humiliated and harassed plaintiff prior to and during *lawful* arrest on basis of plaintiff's race); *United States v. Scopo*, 19 F.3d 777, 786 (2d Cir.) ("Though the Fourth Amendment permits a pretext arrest, if otherwise supported by probable cause, the Equal Protection Clause still imposes restraint on impermissibly class-based discriminations.") (Newman, C.J., concurring), *cert. denied*, —— U.S. ——, 115 S.Ct. 207, 130 L.Ed.2d 136 (1994); *Inada v. Sullivan*, 523 F.2d 485, 489 (7th Cir.1975) (finding right of action under Equal Protection Clause where police officer, motivated by animus toward plaintiff's ancestry, threatened him with deportation); *Tanner v. Heise*, 879 F.2d 572, 580 n. 5 (9th Cir.1989) (where plaintiff alleged "equal protection" violation, police officers' "mere compliance" with state law would

not shield them from liability under § 1983, provided plaintiff could prove that officers' motivation for arrest was to harass plaintiff because of his religious beliefs). Furthermore, a rational factfinder could conclude that, in electing to use excessive force to effect the violent seizure of Alexis's person and her forcible removal from the restaurant, Leporati was motivated by a discriminatory animus. *See Smith v. Fontana*, 818 F.2d 1411, 1420 (9th Cir.) (finding actionable claim where it was alleged that decedent had been subdued through use of excessive force because he was black), *cert. denied*, 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987). We therefore hold, based on the present record, that the Equal Protection Clause claims under section 1983 are trialworthy.[13]

## D. State Law Claims

Since only one state law claim was addressed on the merits below, *see supra* note 12, and federal claims remain pending, the state law claims against Leporati must be remanded as well. *See* 28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction where all claims over which court has original jurisdiction have been dismissed). The dismissal of the state-law claims against the remaining defendants is affirmed.

## III

### CONCLUSION

The district court judgment dismissing the section 1983 claim against Leporati for arresting Alexis without probable cause in violation of the Fourth Amendment is affirmed. The judgments entered in favor of Domina and McDonald's on the section 1981 claim; Domina and Leporati on the section 1985(3) claim; and Domina on the section 1983 procedural due process claim are affirmed. The district court judgment entered in favor of Leporati on the section 1981, excessive force, and Equal Protection Clause claims is vacated, and these claims are remanded for fur-

---

**13.** Of course, Alexis's equal protection claim requires a showing that Leporati treated her differently than he would have treated a white person. We leave open the question of what, if any,

additional evidence might be required *at trial* to satisfy this element. *See Johnson*, 876 F.2d at 483–84 (concurring opinion).

ther proceedings consistent with this opinion, along with all pendent state law claims against Leporati, *see* 28 U.S.C. § 1367(c)(3). The parties shall bear their own costs on appeal.

*SO ORDERED.*

BOWNES, Senior Circuit Judge, concurring, in part, and dissenting, in part.

I concur in all of the court's holdings except the one dismissing the section 1983 claim against Domina. The evidence taken in the light most favorable to the plaintiffs is sufficient, I believe, for a reasonable factfinder to conclude that there was a conspiracy between Domina and Leporati to discriminate against the plaintiff, Yvonne Alexis, because of the color of her skin.

## I.

The facts from which such a conspiracy could rationally be inferred are as follows. A dispute over an incorrect food order occurred at the McDonald's service counter between plaintiff Yvonne Alexis, an African American woman, Donna Domina, the "swing manager," and the counterperson, Alfredo Pascacio. After the dispute was over, Sherry Topham, a McDonald's managerial employee, went outside the restaurant for police assistance. She returned with Officer Leporati, a uniformed off-duty police officer assigned to McDonald's pursuant to an agreement between McDonald's and the Town of Framingham. Leporati conferred with both Topham and Domina, who identified Yvonne Alexis as "that black woman." Domina told Leporati that she wanted Alexis out of the restaurant. Domina made this request even though she was aware Yvonne Alexis and her family had already taken seats preparatory to eating the food they had purchased.

Officer Leporati neither asked Topham and Domina why he should make Alexis leave the restaurant nor made inquiries of anybody else as to the behavior of the Alexis family. Based solely on his initial discussion with Domina and Topham, Leporati proceeded to the dining room table where the Alexis family sat quietly eating their food. He told Yvonne Alexis that she and her entire family had to leave the premises. Yvonne Alexis stated that they would not leave until they finished eating. Upon hearing this, Officer Leporati left the dining area and conferred again with Topham and Domina. He told them that Alexis refused to leave.

During this second discussion, Topham said she had a problem with this woman on a prior occasion. Domina then said, "Well, if that's the case, then maybe we should have her leave." Neither Domina nor Officer Leporati requested information about the alleged prior problem with Alexis. Significantly, Officer Leporati again failed to inquire as to why he was being told to remove Alexis from the restaurant. Instead, he said that "it wouldn't be pretty" but he would make Yvonne Alexis leave if Domina wanted him to. Domina then told him that she wanted Yvonne Alexis out of the restaurant.

Officer Leporati returned to the Alexis table and notified Yvonne Alexis that she would be arrested unless she left within the ten minutes it would take his backup cruiser to arrive. Neither Yvonne nor any member of her family left. When the cruiser arrived, Officer Leporati physically pulled Yvonne Alexis out of her seat and over the table at which she and her family had been eating, bruising her in the process. Yvonne Alexis was then handcuffed, pushed into the cruiser, and taken to jail.

Both Yvonne Alexis and her husband protested the violent treatment she received from Officer Leporati during her removal from the restaurant. At one juncture, Mr. Alexis exclaimed, "We have rights," to which Officer Leporati retorted, "You people have no rights. You better shut up your [expletive] mouth before I arrest you too." Officer Leporati made these comments while still inside the restaurant.

## II.

The majority opinion's cursory treatment of Alexis' section 1983 claims overlooks several factual bases for finding that there was a conspiracy within section 1983's "under color of law" requirement between Domina and Leporati. *See Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 928, 102 S.Ct. 2744, 2749, 73

L.Ed.2d 482 (1982) (" 'under color of law' has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment"). Evidence submitted at trial, when viewed in the "light most favorable to the nonmoving party" and with "all reasonable inferences in that party's favor," *Colonial Courts Apartment Co. v. Proc. Assocs.*, 57 F.3d 119, 122 (1st Cir.1995), supports the view that Alexis' arrest resulted from concerted action between Domina and Leporati.

Section 1983 conspiracies are "commonly defined as 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another'...." *Earle v. Benoit*, 850 F.2d 836, 844 (1st Cir.1988) (quoting *Hampton v. Hanrahan*, 600 F.2d 600, 620–21 (7th Cir.1979), *rev'd in part on other grounds*, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980)). Under this definition, section 1983 liability attaches to private actors deemed "willful participant[s] in [a] joint action with a State or its agents." *Lugar*, 457 U.S. at 941, 102 S.Ct. at 2756; *Dennis v. Sparks*, 449 U.S. 24, 27, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980); *Casa Marie, Inc. v. Superior Court of Puerto Rico*, 988 F.2d 252, 259 (1st Cir.1993). And joint action may be proved by circumstantial evidence of a prearranged conspiracy. *See Wagenmann v. Adams*, 829 F.2d 196, 211 (1st Cir.1987); *see also Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1352 (7th Cir.1985).

I do not contend that joint action existed in this case because Leporati worked the McDonald's detail or that Domina's supervisor, Sherry Topham, requested his assistance. This court has clearly stated that "merely initiating a good faith request for police protection would not attach liability for the subsequent unconstitutional conduct of arresting officers." *Wagenmann*, 829 F.2d at 210; *see also Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423, 1433 (10th Cir.1984), *vacated on other grounds sub nom. City of Lawton v. Lusby*, 474 U.S. 805, 106 S.Ct. 40, 88 L.Ed.2d 33 (1985), *aff'd by* 796 F.2d 1307 (10th Cir.1986)

(a store that employs an off-duty police officer is not vicariously liable under section 1983 for such officer's deprivation of customer's civil rights). But, I am persuaded by the fact that Domina and Leporati conferred on two separate occasions before Alexis' brutal arrest. The record establishes that Domina, not Leporati, made the decision to expel Alexis from McDonald's premises, and that she made that decision with the knowledge that some harm could befall Alexis (Alexis' removal "would not be pretty"). And it is clear that Domina knew that Leporati would do as she requested.

Viewed in context, the events precipitating Yvonne Alexis' claims against Domina cast a long shadow of doubt on the majority's conclusion that there was "no evidence" to suggest Alexis' claims against Domina should have survived summary judgment. The facts—that Leporati consulted with Domina on two occasions; that Leporati based his decision to arrest Alexis on Domina's order; and that it could be found that both Leporati and Domina took Yvonne Alexis' race into account—certainly suggest something more than independent, race neutral, police action. A factfinder could reasonably infer that Domina and Leporati were acting in concert with one another according to an informal plan whereby Leporati would eject anyone from the restaurant identified by Domina as a problem without independently investigating the situation.

Evidence of such substituted judgment arrangements provides a basis for extending section 1983 liability to private actors. *See Cruz v. Donnelly*, 727 F.2d 79, 81 (3d Cir. 1984) (holding evidence of a pre-arranged plan to arrest suspected shoplifters without independently investigating the presence of probable cause was needed to confer section 1983 liability); *Lusby*, 749 F.2d at 1432–33. While it generally does not suffice to show that a police officer fulfilled a private actor's request to arrest someone, courts will impose liability where it is evident the police officer would not have acted without the private actor's order. *Cruz*, 727 F.2d at 81. A failure to investigate, though not dispositive, has been deemed sufficiently demonstrative

of conspiratorial conduct. *See Lusby*, 749 F.2d at 1432.

Despite the majority's attempts to do so, this case cannot be squared with the holding in *Carey v. Continental Airlines, Inc.*, 823 F.2d 1402 (10th Cir.1987). In that case the Tenth Circuit found that there was no substituted judgment where a police officer was called into an airport to arrest a striking airline pilot. The police officer in *Carey*, however, was more of an independent actor than the facts show Officer Leporati was in this case. That officer actually conducted a separate inquiry into the facts before arresting the pilot. 823 F.2d at 1403. Officer Leporati failed to investigate at all, choosing to act solely at Domina's behest. Additionally, it is worth noting that the use of excessive force and obvious racial overtones that marked Officer Leporati's actions in this case were not present in *Carey*.

The current case more closely patterns *Wagenmann v. Adams*, 829 F.2d 196 (1st Cir.1987), a case the majority attempts to distinguish. In that case the private actor enjoyed a close relationship with local police officers and enlisted them in carrying out a plan to eject a potential agitator from his son's wedding ceremony. We held that a section 1983 conspiracy existed, concluding that the defendant in that case was essentially using the law enforcement officials involved to achieve his own, unconstitutional ends. 829 F.2d at 211.

A sound evidentiary basis exists for concluding Domina and Leporati adhered to a substituted judgment policy not unlike the one deemed constitutionally violative in *Wagenmann*. First, the record reveals Domina, not Leporati, as the impetus for the decision to eject Yvonne Alexis. Second, Domina and Leporati, as individuals who worked at McDonald's, could be found to have had a shared understanding to deprive Yvonne Alexis of her rights. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605–06, 26 L.Ed.2d 142 (1970). Leporati worked the McDonald's detail on numerous occasions and must have had a working knowledge of company policy and decision making procedures for removals. Finally, the conversations Domina and Leporati held

regarding Alexis were sufficient in duration and number to cement a conspiracy. These factors convince me that the independent police actions which persuaded the Tenth Circuit that no private liability existed in *Carey* are not present in this case.

I am not dissuaded by the absence of conclusive evidence that an express plan to discriminate existed between Domina and Leporati. The Supreme Court has found a section 1983 violation where there was no formal plan to discriminate. In *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), the Court held that a policeman's presence in a segregated lunch counter might be enough to infer a conspiracy between the police officer and the establishment, where the plaintiff had both been refused service and arrested. In a notable decision the Seventh Circuit found a conspiracy where the state agents with whom the private actor conspired were not actively involved in the deprivation of rights. *See Soldal v. County of Cook*, 942 F.2d 1073 (7th Cir.1991), *rev'd on other grounds by* 506 U.S. 56, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) (finding that private owner and deputy sheriffs conspired to "get rid of a pesky tenant" when sheriffs passively watched an unlawful eviction). It was not necessary that there be evidence of an express plan between Domina and Leporati to implicate section 1983.

There was sufficient evidence from which a factfinder could conclude that Domina and Officer Leporati conspired together to deprive Yvonne Alexis of her due process right not to be arrested without probable cause and that such deprivation was based on the color of Alexis' skin.

For the reasons discussed above, I would reverse the judgment of the district court on the section 1983 claims brought against Donna Domina.