Caron v. Hester, et al.            CV-00-394-M    11/13/01
                    UNITED STATES DISTRICT COURT

                     DISTRICT OF NEW HAMPSHIRE


Joseph Caron,
      Plaintiff

      v.                                 Civil No. 00-394-M
                                         Opinion No. 2001 DNH 206
Brian Hester, John Doe 1,
and John Doe 2,
      Defendants


                         **O R D E R**


      Joseph Caron brings this action against New Hampshire State

Trooper Brian Hester and two of Hester's unidentified

supervisors, seeking damages for injuries he claims to have

sustained during the course of his arrest.  See 42 U.S.C. § 1983.

In count 1 of his complaint, Caron seeks compensation from Hester

for injuries he says he suffered as a result of Hester's alleged

use of excessive force.  In count 2, he seeks damages from

Hester's unidentified supervisors, whom he claims were aware of

prior incidents involving Hester's use of excessive force, yet

did nothing to prevent future abuses by him.

Defendants move for summary judgment as to both counts in Caron's complaint. As to count 2, Caron now concedes that discovery has revealed that Hester has no history of using excessive force at any time during his 22 year career, nor is there anything in his personnel file that would suggest he has a propensity for engaging in such conduct. Accordingly, Caron does not object to the entry of summary judgment in favor of defendants as to count 2. With regard to count 1, however, Caron contends that genuine issues of material fact preclude the court from granting defendants' motion.

## Standard of Review

When ruling upon a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter

2

of law." Fed. R. Civ. P. 56(c). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Intern'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

## Background

Armed with arrest warrants for Caron and his wife (for unlawfully distributing the prescription drug Ritalin), as well as a search warrant for their home, Trooper Hester, members of the New Hampshire Drug Task Force, and members of the Hopkinton Police Department drove to Caron's home on the morning of August 15, 1997. On the way, Hopikinton Police Chief Ira Migdal observed Caron driving in the opposite direction. Chief Migdal reversed direction and stopped Caron. He informed Caron of the warrants, told him that he was being placed under arrest, and instructed him to exit the vehicle and place his hands on the trunk. Caron complied.

By the time Trooper Hester arrived at the scene, Chief Migdal had returned to his cruiser to retrieve a pair of handcuffs. Caron remained standing at the rear of his car, with his hands on the trunk. See Exhibit D to defendants' memorandum (document no. 6), Affidavit of Chief Migdal at paras. 6-7. See also Exhibit 3 to plaintiff's objection (document no. 7), State Police Investigation Report prepared by Trooper Hester. Hester also informed Caron that he was under arrest and patted him down for weapons. Id. There is no dispute that, to this point, Caron was compliant and gave no indication that he posed any threat of flight or violence. The parties do, however, have differing views of what transpired next, when Hester attempted to take Caron into physical custody.

In his affidavit, Caron recounts the relevant events as follows:

> With both of my hands on the trunk of my car, Trooper Hester put one side of the handcuffs on my right wrist, during which time my right hand remained on the trunk of my car. It is my right shoulder that is injured. During the few moments that Trooper Hester was putting

4

the handcuffs on my right wrist, I told him more than once to take it easy, that I had a bad shoulder, that I could not put my arm behind my back, and that I would not cause him any problems. While I was saying this to Trooper Hester, Trooper Hester finished putting the handcuffs on my right wrist and was telling me to put that hand behind my back, ignoring my repeated statements that I could not. Finally, after the time it took for Trooper Hester to finish handcuffing my right wrist and for us to exchange these words, Trooper Hester went ahead and pulled my right arm forcibly toward my back, a motion my shoulder simply cannot make due to the severe limitations in my range of motion. I experienced sudden and excruciating pain. I turned my body in an attempt to protect my shoulder. Trooper Hester immediately used my bad arm to force me to the ground face first. I specifically remember telling Trooper Hester about my injured shoulder well before he pushed me to the ground. I remember Chief Migdal yelling about my shoulder. However, it took Trooper Hester several more moments before he relented.

Exhibit 2 to plaintiff's objection, Affidavit of Joseph Caron at para. 3. Caron does not claim that Hester deviated from normal handcuffing procedures or that he used more than ordinary force to secure the handcuffs on him. Instead, he seems to assert that the force used, though reasonable if applied to an ordinary citizen, was "unreasonable" as applied to him because his

5

shoulder condition rendered him more susceptible to injury than an ordinary citizen.[1]

Trooper Hester, on the other hand, recalls the relevant events somewhat differently.

> I went to the location where Mr. Caron had been stopped and exited from my car, and walked over to Mr. Caron. When I approached him, Mr. Caron was standing with this hands on the trunk. I told Mr. Caron that I was placing him under arrest. At that time, Mr. Caron did not mention that he had a pre-existing shoulder injury, or that he had had surgery on his shoulder. I took hold of his right arm hand and placed a handcuff on his wrist. I then took hold of his right hand and began pulling it back in order to place the handcuff on his other arm. At that moment, Mr. Caron yelled "What are you doing?" and started pulling his arms away from me and twisting his body away from me.

---

[1] Caron's complaint alleges only that Hester used excessive force during his initial efforts to take Caron into custody on the side of the road. See Complaint at paras. 10-13, and 21. Caron's affidavit, however, makes vague reference to subsequent, allegedly excessive, conduct on the part of Hester at Caron's home, while police officers executed the search warrant. See Caron affidavit at para. 8. Even if Caron had included those allegations in his complaint, however, they do not describe conduct on the part of Hester that even arguably might be described as excessive force. Consequently, the court has focused exclusively on the claims set forth in Caron's complaint concerning his treatment at the roadside stop.

> At this point, it appeared to me that Mr. Caron was
> resisting arrest. . . . In order to keep control of Mr.
> Caron and to avoid a dangerous situation from
> developing I made a rapid decision to place Mr. Caron
> on the ground.  I retained my hold on the hand with the
> handcuff, and using my other arm in his back, I pushed
> him face-down onto the ground.  I did not slam him on
> the ground or use any more force than was necessary.

Exhibit C to defendants' memorandum, Affidavit of Trooper Brian Hester at paras. 5-7.  Hester says that once Caron was on the ground, Chief Migdal told him that Caron had undergone shoulder surgery in the past.  According to Hester, "Once I learned that fact, I stopped my efforts to handcuff Mr. Caron and told him to calm down.  Once Mr. Caron had calmed down, I agreed to allow Mr. Caron to be handcuffed in the front."  Id., at para. 7.

Hester's account is largely supported by that of Chief Migdal, who described the relevant events as follows:

> As I was going back to my cruiser [to retrieve a pair
> of handcuffs], Trooper Hester . . . arrived, and
> Trooper Hester began placing Caron under arrest.  At no
> point did I hear the Plaintiff inform Trooper Hester
> about his shoulder injury.

7

I observed Trooper Hester begin drawing one of Caron's arms behind his back for the purpose of applying handcuffs. Mr. Caron immediately straightened up and began pulling away from Trooper Hester and began twisting his body around. Trooper Hester reacted immediately and, using a straight-arm takedown technique, placed Joseph Caron face down on the ground.

I quickly ran over and told Trooper Hester that Caron had a shoulder injury and to take care with it. Trooper Hester immediately released the pressure on Caron's arm. I spoke with Caron and told him if he would relax and behave himself, I would handcuff him in the front.

Exhibit D to defendants' memorandum, Affidavit of Chief Ira Migdal at paras. 7-9.[2]

---

[2] Although Chief Migdal says he did not hear Caron warn Trooper Hester about his shoulder injury, his affidavit does not reveal whether he was close enough to Caron's vehicle to overhear any conversations that might have occurred prior to, or during, Hester's efforts to handcuff Caron. The fact that Chief Migdal had to "run over" to inform Hester of Caron's shoulder injury suggests that he might have been far enough away to have missed any statements Caron might have made to Hester about his shoulder injury.

## Discussion

The only material factual dispute identified by Caron concerns whether he informed Hester of his shoulder injury <u>prior</u> to Hester's efforts to handcuff him. Construing the facts in the light most favorable to Caron, the non-moving party, the court will, for purposes of addressing defendants' motion, assume that Caron <u>did</u> tell Hester that he had "a bad shoulder" and "could not put [his] arm behind [his] back." The legal questions presented by defendants' motion for summary judgment, then, are: (1) whether, in light of that information, Hester violated Caron's constitutional rights by using excessive force in attempting to handcuff him; and (2) if Hester did use excessive force, if he is nonetheless entitled to qualified immunity.

I.    <u>Excessive Force</u>.

Claims of excessive force in the context of an arrest are analyzed under the Fourth Amendment, which guarantees citizens the right "to be secure in their persons . . . against unreasonable . . seizures." See <u>Graham v. Connor</u>, 490 U.S. 386,

9

394 (1989). Consequently, to prevail on his excessive force claim, Caron must demonstrate that Trooper Hester's conduct was not objectively reasonable when viewed in light of the facts and circumstances facing him at the time, and without regard to his subjective intent or motivation. See Alexis v. McDonald's Restaurants of Massachusetts, Inc., 67 F.3d 341, 352 (1st Cir. 1995).

While the term "reasonable" is a familiar one, used often in the context of negligence claims, the court of appeals for this circuit has noted that it has a more "generous" meaning in the context of excessive force claims.

> [T]he Supreme Court's standard of reasonableness is comparatively generous to the police in cases where potential danger, emergency conditions or other exigent circumstances are present. In Graham v. Connor, the Court said that the "calculus of reasonableness" must make "allowance" for the need of police officers "to make splitsecond judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation."

Roy v. Inhabitants of City of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994). The court concluded that, "the Supreme Court intends to surround the police who make these on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases." Id. See also Graham, 490 U.S. at 396 ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it . . . Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.") (citation and internal quotation marks omitted).

In determining whether an officer's conduct was objectively reasonable under the circumstances, the court (or trier of fact, as the case may be) must consider, among other things, the following factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest

11

or attempting to evade arrest by flight." Graham, 490 U.S. at 396. See also Alexis, 67 F.3d at 352-53. As the Court of Appeals for the Ninth Circuit has observed, "the force which was applied must be balanced against the need for that force: it is the need for force which is at the heart of the consideration of the Graham factors." Alexander v. City and County of San Francisco, 29 F.3d 1355, 1367 (9th Cir. 1994).

In this case, the court must focus, at least initially, on Hester's decision to handcuff Caron behind his back, notwithstanding Caron's accepted statements that he had a bad shoulder and could not extend his right arm behind his back. Hester's subsequent decision to put Caron on the ground, after it objectively appeared that Caron was resisting, was certainly reasonable, particularly since decisions of that sort must be made in the context of rapidly evolving circumstances in which an officer might reasonably be concerned for his or her own safety. All the evidence suggests that Hester used no more force than was reasonably necessary to control Caron and promptly relented once

12

he was subdued.  And, after Chief Migdal informed Hester of Caron's history of shoulder surgery, Hester agreed to handcuff Caron with his hands in front.

Nevertheless, if Hester's decision to handcuff Caron behind his back was itself unreasonable, it unnecessarily created a situation in which Caron was needlessly exposed to potential injury.  Consequently, the fact that Hester was required to make a split-second decision about how to handle Caron's apparent efforts to resist arrest is not material.  The legally relevant question is whether Hester was justified, at the outset, in attempting to handcuff Caron with his hands behind his back - the decision that set in motion the events that ultimately lead to Caron's alleged injuries.

Several things can be said of the circumstances surrounding Hester's decision to handcuff Caron.  First, Hester was not operating under any sort of time constraint or pressure.  When he arrived at the scene, Caron was already standing calmly at the

rear of his vehicle with his hands on the trunk.  Moreover, the fact that Chief Migdal left Caron unattended while he searched for a set of handcuffs suggests that he did not consider Caron to pose any immediate danger or a risk of flight.  And, up until the point at which Hester attempted to place Caron's arm behind his back, Caron showed no signs that he intended to resist.  Finally, as to the "severity of the crime at issue," Graham, 490 U.S. at 396, reasonable minds might disagree as to the seriousness of distributing Ritalin without a prescription, but nothing about that crime, or the circumstances surrounding Caron's alleged commission of it, suggests that Caron was likely to pose a physical threat to the arresting officers.  Consequently, accepting the relevant facts as presented by Caron, "all the surrounding circumstances, individually and in combination, plainly counseled minimal force in effecting any arrest." Alexis, 67 F.3d at 353.

Whether Hester used appropriate "minimal force" in effectuating Caron's arrest and, indeed, whether Hester's conduct

14

was "reasonable," turns on whether (or the extent to which) police officers must credit a suspect's unsupported claim that he or she suffers from some injury or physical condition that reasonably precludes handcuffing the suspect in the normal manner – with his or her hands behind the back.

Cases of this sort are necessarily fact specific and sui generis. Nevertheless, the opinions of other courts provide some useful guidance in this area. In cases involving suspects who display some objective indicia of injury or disability (e.g., cast, sling, neck brace, wheel chair, etc.), there appears to be general agreement that officers must take note of the suspect's complaints and make some effort to accommodate the claimed conditions or injuries, provided the circumstances permit such an accommodation. See, e.g., Guite v. Wright, 147 F.3d 747 (8th Cir. 1998) (officer's motion for summary judgment as to excessive force claim denied where officer forcibly restrained plaintiff who was "recovering from surgery on his left shoulder and was wearing a sling on his left arm" at the time); Howard v.

15

<u>Dickerson</u>, 34 F.3d 978 (10th Cir. 1994) (officer's motion for summary judgment denied as to plaintiff's claim that officer showed deliberate indifference to medical condition by handcuffing her behind her back when she was wearing a neck brace, she told the officer of her injury and recent surgery, and third party confirmed that plaintiff should not be handcuffed behind her back).

There is, however, a lack of consensus when the suspect's claims concerning his or her injury are not supported by such objective manifestations. <u>Compare</u> <u>Morreale v. City of Cripple Creek</u>, 1997 WL 290976 (10th Cir. 1997) (officer used force that was neither "substantial" nor "abusive" and, therefore, not "excessive" where, despite suspect's request that she be handcuffed in front to avoid exacerbating a pre-existing shoulder injury, officer handcuffed her in back); <u>Jackson v. City of Bremerton</u>, __ F.3d __, 2001 WL 1173792 (9th Cir. Oct. 5, 2001) (officer did not use excessive force in allegedly pushing suspect to the ground and kneeling on her back, notwithstanding suspect's

16

having informed officer of her preexisting back and shoulder injuries); with Stocker v. City and County of San Francisco, 1999 WL 402236 (9th Cir. 1999) ("The dispute as to whether Mr. Stocker told the officers that the injury to his shoulder prevented his arms from being pulled back without causing severe pain or further damage precludes summary judgment on his excessive force claim."); Walton v. City of Southfield, 995 F.2d 1331, 1342 (6th Cir. 1993) (concluding that "an excessive force claim could be premised on [defendant's] handcuffing [plaintiff] if he knew that she had an injured arm and if he believed that she posed no threat to him.").

Accepting Caron's version of the facts as true and crediting his claim to have specifically told Hester that he intended to fully cooperate and that he suffered from a pre-existing shoulder injury that prevented him from putting his right arm behind his back, the court cannot conclude, as a matter of law, that the force used by Hester under the described circumstances was objectively reasonable. Crediting Caron's claims, particularly

17

in light of the record's disclosure that Caron was cooperative and posed neither a flight risk nor danger to the officers or others, it is conceivable that a properly instructed jury might reasonably conclude that Hester employed more force than reasonably necessary in attempting to handcuff Caron behind his back.  See generally Alexis, 67 F.3d at 353 (acknowledging, at least implicitly, that the "reasonableness" of force used by police officers is typically a factual question that must be resolved by the jury) (citing cases).  Consequently, the court cannot conclude, as a matter of law, that Hester did not violate Caron's Fourth Amendment rights in effecting his arrest.  Whether he did or did not depends upon resolution of a material factual dispute.

II.  Qualified Immunity.

Having concluded that genuine issues of material fact preclude the court from holding, as a matter of law, that Hester used reasonable force under the circumstances in attempting to handcuff Caron behind his back, the court next turns to Hester's

assertion that, even assuming Caron's constitutional rights were violated, he is nonetheless entitled to qualified immunity.

Parenthetically, the court notes that Caron erroneously argues that the standard used to determine whether Hester violated his constitutional right to be free from excessive force is identical to the standard employed to determine whether Hester is entitled to qualified immunity. Specifically, Caron claims:

> The law governing excessive force was clearly established as of August, 1997, and defendants do not argue otherwise, which law essentially requires police officers to act reasonably in using force to complete an arrest. Thus, Trooper Hester is entitled to qualified immunity if he acted reasonably in arresting plaintiff. That is precisely the same question asked above. That is, defendants' dual arguments for summary judgment are actually the same.

Plaintiff's objection (document no. 7) at paras. 16-17 (citations omitted). The Supreme Court has, however, explicitly rejected that argument.

> The Court of Appeals concluded that qualified immunity is merely duplicative in an excessive force case, eliminating the need for the second step [i.e., was the

officer's conduct "objectively reasonable"] where a constitutional violation could be found based on the allegations. In <u>Anderson</u>, a warrantless search case, <u>we rejected the argument that there is no distinction between the reasonableness standard for warrantless searches and the qualified immunity inquiry</u>. We acknowledged there was some "surface appeal" to the argument that, because the Fourth Amendment's guarantee was a right to be free from "unreasonable" searches and seizures, it would be inconsistent to conclude that an officer who acted unreasonably under the constitutional standard nevertheless was entitled to immunity because he 'reasonably' acted unreasonably. This superficial similarity, however, could not overcome either our history of applying qualified immunity analysis to Fourth Amendment claims against officers or the justifications for applying the doctrine in an area where officers perform their duties with considerable uncertainty as to whether particular searches or seizures comport with the Fourth Amendment.

<u>Saucier v. Katz</u>, 121 S.Ct. 2151, 2157 (2001) (citations and internal quotation marks omitted) (emphasis supplied). Consequently, the court again held that qualified immunity shields those officers who make "reasonable mistakes as to the legality of their actions." <u>Id.</u>, at 2159.

Turning, then, to Hester's assertion that he is entitled to qualified immunity, the court must engage in a two-step inquiry.

20

> The first prong is whether the constitutional right in question was clearly established at the time of the alleged violation. In the second prong, the court employs an "objective reasonableness" test in determining whether a reasonable, similarly situated official would understand that the challenged conduct violated the established right.

Napier v. Town of Windham, 187 F.3d 177, 183 (1st Cir. 1999) (citation omitted). At the first stage of that inquiry - determining whether the constitutional right at issue was "clearly established" - courts must "define the right asserted by the plaintiff at an appropriate level of generality." Brady v. Dill, 187 F.3d 104, 115 (1st Cir. 1999). To qualify as a clearly established right, "the law must have defined the right in a quite specific manner, and . . . the announcement of the rule establishing the right must have been unambiguous and widespread, such that the unlawfulness of particular conduct will be apparent ex ante to reasonable public officials." Id., at 116. See also Saucier v. Katz, 121 S.Ct. 2151, 2156 (2001) ("[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the

right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition."); Anderson v. Creighton, 483 U.S. 635, 640 (1987) ("[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). As the Supreme Court recently observed:

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

Saucier, 121 S.Ct. at 2158.

22

A difficult question is presented in this case regarding the level of specificity with which it is appropriate to define the constitutional right Caron claims was violated. All can agree that the right not to be subjected to "unreasonable" or "excessive" force during the course of an arrest was, when Caron was taken into custody, clearly established. However, "a reasonable official's awareness of the existence of an abstract right, such as a right to be free from excessive force, does not equate to knowledge that <u>his</u> conduct infringes the right." <u>Smith v. Mattox</u>, 127 F.3d 1416, 1419 (11th Cir. 1997) (emphasis in original). And, if the constitutional right Caron claims was infringed must necessarily be defined more precisely, it is far less clear that such a right was "clearly established" at the time.

The record demonstrates that the force employed by Hester against Caron was, objectively, de minimus. And, as the Supreme Court has observed, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of

23

physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396. Except for Caron's preexisting shoulder injury, and the fact that it allegedly rendered him more fragile than an ordinary person, he would have suffered no discomfort or lasting effects from the manner in which Hester applied the handcuffs. Reduced to its essence, then, the question presented is whether Caron had a clearly established right not to be handcuffed behind his back after he allegedly informed Hester of his shoulder injury. He did not.

Caron has pointed to no precedent that would support his necessary claim that, at the time of his arrest, it was clearly established that police officers use unlawful and excessive force when they handcuff a suspect behind the back, notwithstanding the suspect's unsupported claim to suffer from an injury that either prevents, or would be exacerbated by, such conduct. See generally Saucier, 121 S.Ct. at 2160 ("[N]either respondent nor the Court of Appeals has identified any case demonstrating a

24

clearly established rule prohibiting the officer from acting as he did, nor are we aware of any such rule.").

To be sure, as noted above, there are cases that involved police officers' use of excessive force against a suspect who had visible signs of an injury or medical condition that should have established the reasonable likelihood of a suspect's vulnerable condition and counseled against the level of force actually employed. See, e.g., Guite, 147 F.3d at 750 (officer not entitled to summary judgment on qualified immunity grounds where, notwithstanding fact that suspect was wearing a sling on his arm, officer grabbed his wrist, pushed him, and held him against a door); Howard v. Dickerson, 34 F.3d at 980-81 (officers not entitled to summary judgment on qualified immunity grounds where suspect advised officers that she had just undergone surgery, she was wearing a neck brace, and third party advised officers not to handcuff her with her hands behind her back). In cases of that sort, it is both logical and reasonable to expect police officers to recognize that the suspect is potentially more susceptible to

injury than the ordinary citizen and to require the officers to act accordingly.

In this case, however, the only "evidence" of Caron's preexisting shoulder injury was his statement to that effect - a statement, no doubt, uttered by many suspects who, if given the choice, would prefer not to be handcuffed at all and, if they must be restrained in that manner, would prefer that the handcuffs be in front. Trooper Hester was not confronted with any objective manifestation of Caron's claimed shoulder problem.

Because qualified immunity shields "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341 (1986), Hester is entitled to qualified immunity as long as a reasonable police officer in his position could have believed that attempting to handcuff Caron behind his back, notwithstanding his oral protestation, was lawful. See Anderson, 483 U.S. at 641 ("The relevant question in this case, for example, is the objective (albeit fact-specific) question

26

whether a reasonable officer could have believed Anderson's [conduct] to be lawful, in light of clearly established law and the information the [officers] possessed.").

Although the Court of Appeals for the First Circuit has yet to confront this particular issue, several other courts have done so and concluded, at a minimum, that a suspect who displays no visible signs of being unusually vulnerable or fragile, is not subjected to excessive force when a police officer uses customary, reasonable force in applying handcuffs or otherwise effecting an arrest. For example, the District Court for the Northern District of Alabama recently concluded that police officers were entitled to qualified immunity, notwithstanding the fact that the suspect, an elderly woman with heart problems who told officers she was "suffocating," suffered a mild heart attack as officers were attempting to take her into custody. The court concluded that:

> The issue is whether [the officer] used excessive force
> in accomplishing the arrest. There is no reasonable
> inference that he used excessive force. It is a sad

27

fact that any confrontation and any force may have contributed to a heart attack. The result, however, does not convert reasonable force under the circumstances into excessive force. There is no reasonable inference that [the officer] knew or should have known that handcuffing the plaintiff when she was "smothering" from the heat would cause her a severe injury.

Hendon v. City of Piedmont, __ F. Supp. 2d __, 2001 WL 1078158 (N.D.Ala. Sept. 11, 2001).

In Wells v. State of Oklahoma, 1996 WL 557722 (10th Cir. Sept. 30, 1996), the Court of Appeals for the Tenth Circuit reached a similar conclusion in a case virtually identical to this one. There, the suspect claimed that he told the arresting officer that "my arm [is] full of plates and screws, and I [have] limited movement and it [will] not go behind my back." Id., at * 1. Nevertheless, the suspect claimed the officer disregarded his statement and "took his arms and forcefully pulled them behind his back." Id. Notwithstanding the fact that the suspect was cooperative and non-threatening, and the crime for which he was arrested was a misdemeanor, the appellate court concluded that

28

the force applied was neither unreasonable nor excessive, despite resulting injury to the suspect.

> Although handcuffed, the degree of force used to restrain [plaintiff] was minimal.  [The officer] testified that the handcuff technique he used was the least forceful and restrictive of the three he considered.  We noted in [a prior opinion] that the first duty of a police officer is to ensure the safety of the officers and the public.  Handcuffing is a necessary expedient to this end.  We have also held that the right to arrest an individual carries with it the right to use some physical coercion to effect the arrest.

Id., at *3 (citations and internal quotation marks omitted). Accordingly, the court concluded that "putting handcuffs on a potentially fragile arrestee without use of abnormal force" is not unlawful.  Id.  See also Morreale, 1997 WL 290976 at *1 (officer entitled to summary judgment, notwithstanding the fact that suspect specifically told him she could not be handcuffed with her hands behind her back due to a shoulder injury); Jackson, __ F.3d __, 2001 WL 1173792 (9th Cir. Oct. 5, 2001) (officer entitled to judgment, notwithstanding fact that suspect told him she suffered from back and shoulder injuries and claimed

the officer injured her by pushing her to the ground, placing his knee on her back, and applying handcuffs). See generally Nolin v. Isbell, 207 F.3d 1253, 1257-58 (11th Cir. 2000) ("[T]his circuit has established the principle that the application of de minimus force, without more, will not support a claim for excessive force in violation of the Fourth Amendment. . . . We again hold, . . . that a minimal amount of force and injury, as present in the facts of this case, will not defeat an officer's qualified immunity in an excessive force case.").

In light of the current legal landscape, the court cannot conclude that Caron had a "clearly established" right to be handcuffed in front (or not at all) after he informed Hester of his shoulder injury or, viewed somewhat differently, that he had a "clearly established" right not to be handcuffed with his hands behind his back once he invoked a shoulder injury. Consequently, a reasonable officer would not have understood that attempting to handcuff Caron with his hands behind his back after he claimed to have a shoulder injury amounted to a violation of Caron's

30

constitutional right to be free of excessive force. Trooper Hester is, therefore, entitled to qualified immunity. <u>See generally</u> <u>Joyce v. Town of Tewksbury</u>, 112 F.3d 19, 22-23 (1st Cir. 1997) ("Given the unsettled state of the law, we have no hesitation in concluding that the officers in this case are protected by qualified immunity, which protects public officials against section 1983 liability so long as they acted reasonably. . . . Because it is not even clear that there was a violation - a point we do not decide - there certainly was no violation so patent as to strip the officers of qualified immunity.").

## Conclusion

The legal question presented by this case and those involving similar facts is a difficult one: under what circumstances and to what degree must a police officer credit a suspect's unsupported claim that he or she suffers from an injury or physical condition that necessarily prevents the suspect from being handcuffed in the ordinary manner with minimal force - with his or her hands behind the back. On the one hand, courts do not

want to vest suspects with casual veto power over efforts to handcuff them simply by claiming to have a bad wrist, arm, shoulder, back, etc. To require police officers to universally credit such unsupported claims, or embark upon an investigation into those claims, would needlessly interfere with their duties and, perhaps, expose them and members of the public to unnecessary risk in rapidly evolving situations. On the other hand, courts are justifiably concerned that police officers use only that amount of force reasonably necessary to take a suspect into custody and that they exercise common sense and reasonable judgment when restraining a visibly debilitated suspect (or even one who merely claims to be injured). Rigid protocols and standard operating procedures can never replace common sense and reasonable judgment under the circumstances actually presented.

Those potentially conflicting interests make it difficult to articulate general, broadly applicable rules governing the amount of force police may and may not use when taking suspects into custody. It is all the more difficult to establish bright-line

rules governing the circumstances under which police may (and may not) handcuff a suspect with his or her hands behind the back. Consequently, it is not surprising that many of the judicial opinions addressing the issue are unpublished, involve unique circumstances, and provide little basis upon which to craft generally applicable principles. Nor is it surprising that none clearly and unequivocally states that suspects either do or do not have a constitutional right to be handcuffed in front if they claim to have an injury making it painful or difficult to place their hands behind their back. Instead, courts prefer to address each case based upon the unique facts and circumstances that gave rise to it, limiting any holding to the unique circumstances of that particular case. As a result, there is no precedent "clearly establishing" the right Caron claims Hester violated. In fact, there is a modest body of law standing for the proposition that what Hester allegedly did was entirely lawful.

In summary, then, it is agreed that in attempting to handcuff Caron, Hester used only that force reasonably necessary

33

to handcuff a suspect of ordinary constitution. Objectively, nothing about his conduct was excessive or abusive. It was only because Caron suffered from a shoulder injury and was more susceptible to pain and damage to his shoulder than the ordinary citizen that he sustained any injury in the course of his arrest. Of course, if Caron had some outward indicia of injury (e.g., a cast or neck brace), or if Caron had asked Chief Migdal to confirm his injury before Hester applied the handcuffs, or if Chief Migdal had volunteered that information, one might plausibly conclude that even the use of ordinarily appropriate force against Caron might have been excessive. However, even accepting Caron's version of the facts, the only indication Hester had that Caron suffered from a bad shoulder was Caron's unsupported statement to that effect - a statement Caron says he made while Hester was already in the process of handcuffing him. Under those circumstances, it is unlikely that a jury could reasonably conclude that Hester's conduct was either unreasonable or excessive under the circumstances. But, even if Hester did use excessive force, it cannot plausibly be said that a

34

reasonable and well trained police officer would have realized that Hester's conduct would violate any of Caron's clearly established constitutional rights - here, the asserted right not to be handcuffed with his hands behind him upon invoking a shoulder injury. <u>See, e.g.</u>, <u>Saucier</u>, 121 S.Ct. at 2156-57 ("If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.").

In light of the foregoing, Trooper Hester is entitled to qualified immunity and judgment as a matter of law. Defendants' motion for summary judgment as to both counts in plaintiff's complaint (document no. 6) is, therefore, granted. The Clerk of the Case shall enter judgment in accordance with this order and close the case.

35

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

November 13, 2001

cc:  Michael J. Sheehan, Esq.
     Andrew B. Livernois, Esq.