**Andrea HARDY, et al., Plaintiffs**

v.

**Jason EMERY, Defendant**

**No. CIV. 02–089–BK.**

United States District Court,
D. Maine.

Jan. 23, 2003.

Brett D. Baber, Esq., Baber & Weeks, Bangor, ME, for Andrea Hardy, Quiana Harvey, Dorothy Moss, plaintiffs.

Edward R. Benjamin, Jr., Esq., Thompson & Bowie, Portland, ME, for Jason Emery, defendant.

## MEMORANDUM OF DECISION [1]

KRAVCHUK, United States Magistrate Judge.

Andrea Hardy, Quiana Harvey, and Dorothy Moss brought suit pursuant to 42

U.S.C. § 1981 and 42 U.S.C. § 1983, claiming that Jason Emery, a police officer with the Pittsfield Police Department, violated their statutory and constitutional rights to equal protection under the law. The case arises out of Emery's arrest of the plaintiffs flowing from a neighborhood dispute involving the plaintiffs' children and the children of a white [2] woman. I now **DENY** Emery's motion for summary judgment because there are genuine issues of material fact in dispute in this case.

### *Summary Judgment Standard*

I can grant summary judgment to Emery only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that [Emery] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material if its resolution would "affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *id.* I review the record in the light most favorable to Harvey, Hardy, and Moss, the opponents of summary judgment, and I indulge all reasonable inferences in their favor. *See Feliciano de la Cruz v. El Conquistador Resort & Country Club,* 218 F.3d 1, 5 (1st Cir.2000).

### *Material Facts*

Plaintiffs Andrea Hardy and Quiana Harvey, two African American women,

---

1. Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge Margaret J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.

2. I use the term "white" to describe the non-African American participants in the events underlying this action because "white" and "Caucasian" were the terms used by the par-

ties in setting forth their facts. I steer away from "Caucasian" because it is not at all clear to me that the parties were intending to be so technical in their racial classification. *See also* 42 U.S.C. § 1981 (using the term "white citizens"). The plaintiffs self-describe themselves as African American United States Citizens.

were living at the Pittsfield Park Apartments in Pittsfield, Maine in August 2001, with their three daughters, ages one-year, five-years, and twelve-years. On August 31, 2001, Hardy's cousin Dorothy Moss, also African American, brought her four children, ages six-years, five-years, two-years, and eleven months, to visit Hardy at the Hardy/Harvey apartment.

During that afternoon, older children of Erin Schoenig, a white neighbor to Hardy and Harvey, began taunting the children of the plaintiffs who were playing in the common area of the apartment complex. Schoenig's kids called the plaintiffs' kids niggers, stated that their parents were "gay," and sprayed perfumed water in their faces. When Moss was told by the kids about the hostilities, Moss went to Schoenig's apartment and attempted to talk with her. Schoenig told Moss that Schoenig's children did not do anything wrong and that they would not pick on the plaintiffs' children.

Moss states that when she attempted to leave the Schoenig apartment, Schoenig closed the door on Moss's foot, trapping her footwear in the door.[3] Moss retrieved her shoe and went to the apartment of another cousin, Elisha Merriweather, and called the Pittsfield Police Department. Moss was angry and crying and would not give the dispatcher her name. The dispatcher told her that because Moss was not speaking clearly enough and would not give her name there was nothing that they could do, he was too busy to take the complaint, and she should call back later. (Moss Dep. at 8—10.) Moss asked that a police officer be sent over and she told the dispatcher that she would be standing outside.[4] Thereafter, the plaintiffs went to the front of the apartment complex and saw ten to fifteen white people outside screaming and yelling.

The defendant Jason Emery is a police officer employed by the Town of Pittsfield who was on patrol duties in Pittsfield on August 31, 2001. At approximately 4:40 that afternoon Emery was dispatched to the scene for a threatening-type complaint but was not advised of the name of the complainant.[5] Indeed, he acknowledges, that he "had little information other than the address to which he was being dispatched and the nature of the complaint as [being] some type of threat against the complainant."

Moss observed Emery's arrival at the apartment complex and believed that he was responding to her call. As he arrived Emery was flagged down by a white male and Emery decided to speak with this man initially because Emery presumed him to be the complainant. As he exited the

---

**3.** Emery states that he has no personal knowledge of this interaction but denies the allegation based on the information provided him by an eyewitness to this encounter. However, Emery's Statement of Material Fact ¶ 4 does not support this denial.

**4.** In Moss's opinion the dispatcher refused to document her complaint because of her identifiable African American accent. Stating that he has no personal knowledge of whether Moss called the dispatch office, Emery denies Moss's call-related allegation "based on information given him by dispatch" and his conversation with a man when he arrived at the scene. However his cited affidavit statement

does not support the conclusion that Emery knew for a certainty that Moss did not call the dispatch office as, at the time he was dispatched Emery was not given the name of the person complaining (Emery Aff. at ¶ 2) and there is nothing in this record to establish that the dispatcher did not receive two calls.

**5.** Again, Emery attempts to assert that his dispatch was based on Schoenig's call and that she had reported that a neighbor was threatening her. The plaintiffs assert that this is hearsay. It is not at all clear from the cited portion of Emery's affidavit (Emery Aff. ¶ 2) from where and when Emery garnered this understanding.

cruiser he was approached by a group of women and children, including the plaintiffs, who were insisting on speaking with him. The white male who flagged him approached Emery. At this time Emery heard the plaintiffs tell Emery that they were the ones who had called the police.[6]

The plaintiffs state that Emery refused to look at them or acknowledge them even though they had informed him that they had called. (DSMF ¶ 67; Pls.' Resp. SMF ¶ 67.) Emery asserts that he advised the plaintiffs that they would have to wait as he was trying to speak with the male who had first stopped him. (Emery Aff. ¶ 3.) He represents that the plaintiffs' group did not want to wait, even for a moment, and began screaming at Emery that he was refusing to talk to them because they were black. (Id.) He states that he advised the group that this was not the case but that he needed to speak with the complainant first. The plaintiffs assert that they continued to try to get Emery's attention but Emery would not acknowledge them despite their close proximity to him. (Hardy Dep. at 12 –13, 15–16; Moss Dep at 12 – 13.)

There is no dispute that Emery then got in his car to speak with the white male who he presumed at the time to be the complainant. Emery asserts that because of the shouting from the "loud and unruly group" he had to place the man in the cruiser so that he could hear the man's responses to Emery's questions. (Emery Aff. ¶ 3; Hardy Dep. at 12–13.) Moss acknowledges that she was talking too much for Officer Emery and the man, was interrupting their conversation with state-

ments such as, "that's not right," and that the two men got into the cruiser as a result of her interruptions. However, the plaintiffs state that they were not being loud and unruly but were voicing their displeasure and disbelief at Emery's choice to speak first with a white male, acting like they were not even there. (Hardy Dep. at 16; Harvey Dep. at 8; Moss Dep. at 12.)

Emery reports that during the cruiser conversation the man told him that he had been standing outside the apartment next door to Erin Schoenig's and observed a "black" female entering the residence. Shortly afterwards the man saw the "black" female exiting the residence in what the man described as "a rage." The man informed Emery that when exiting the residence the woman picked up a child's scooter and threw it on the ground. He informed Emery that the way that this "black" woman (Moss) was acting made him fear for the safety of the children in the area. The man told Emery that Erin Schoenig was the person who had called the police (though there is no indication in this record of how he would have come to this conclusion).[7] Emery decided to go to the Schoenig apartment based on this information and because her address, 46 Leighton Street, was the address given to Emery by the dispatch.

After approximately five minutes of conversation with this man Emery left the cruiser, walked directly past the plaintiffs, and went into Erin Schoenig's house to speak with her. As Emery walked past the plaintiffs the plaintiffs again tried to get his attention. The plaintiffs assert

6. Emery asserts that this representation to him was false, which I assume means that he did not believe the plaintiffs on this score at the time of the incident.

7. The plaintiffs' object to this paragraph of facts describing what the man told Emery on

the grounds that it is inadmissible hearsay. It seems highly likely that a trial judge would allow this testimony, not for the truth of the matter asserted, but for the effect the alleged information had on Emery.

**42**

that Emery again ignored them. (Hardy Dep. at 17; Harvey Dep. at 8–9; Moss Dep. at 13.) But Emery contends that he was forced to go inside Schoenig's apartment because the "African Americans" were still outside "screaming and interfering with [his] ability to interview anyone," and that he told them that they would just have to be patient. (Emery Aff. ¶ 5; Emery Dep. at 16–17.)

While Emery was inside the Schoenig apartment Hardy became upset. In her view Emery seemed to be ignoring their requests for assistance in resolving the apparent racial hostilities directed at the plaintiffs' young children, a disregard demonstrated by Emery's decision to speak to the mother of the children causing the hostilities rather than the actual victims. To express her consternation Hardy loudly said "I don't give a f* * *, if anybody touches anything that looks like me, I guess I will be going to jail because I'm going to kick somebody's ass." Hardy was referring to her children and her nieces and nephews. She made this declaration because she wanted everybody to hear her. Although there was no one out in front of the apartment at the time she wanted her sentiments heard within the Schoenig apartment.

Immediately, and in response to this remark, Emery returned outside and asked the group to be quiet. He observed that many of the other tenants in the apartment complex had come outside to see what was occurring. Members of the plaintiffs' group continued to shout, indicating that because they were black Emery was refusing to speak with them. The plaintiffs allege that Emery told Hardy that if she "said another mother f* * * * * * word, she was going to jail." (Hardy Dep. at 19; Harvey Dep. at 10; Moss Dep. at 14.) Emery denies that he

used that precise language but states, and the plaintiffs acknowledge, that he did warn about the possibility of arrest if their disorderly conduct continued. (Emery Aff. ¶ 5; Emery Dep. at 19.) Emery contends that he advised the plaintiffs that he was going to speak with them but that they said that they were not going to quiet down. (Emery Aff. ¶ 5.)

There is no dispute that Emery then advised Hardy that she was receiving her last warning before going to jail at which point Hardy held up her wrists as if she was being handcuffed. However, the parties are not in agreement on what transpired next. Hardy contends that she did not say another word. (Hardy Dep. at 19; Moss Dep. at 14; Harvey Dep. at 10–11.) She contends that when Emery handcuffed Hardy he used sufficient force to cause visible swelling on her wrists even though she did nothing to resist. (Hardy Dep. at 20, 29). Emery asserts that Hardy began screaming again and when he advised her that she was under arrest she "was screaming that she would go to jail." (Def.'s Resp. SMF ¶ 28; Emery Aff. ¶ 5.) Emery avers that when he went to handcuff her Hardy stated (in an apparent change of heart) that she would not go to jail and tried to pull away from Emery. (Emery Dep. ¶ 5.) He was eventually able to handcuff her and take her into custody though she physically resisted his efforts to do so. (*Id.*) [8] Emery's counterpoint to Hardy's claim of injury is that she testified that she only experienced transitory soreness of her wrists which resolved in a day or so. (Hardy Dep. at 29–30.)

The parties agree that at this juncture Harvey became upset with Emery, questioning him why he was arresting Hardy. Emery had difficulty handcuffing Hardy with the physical interference by Harvey

8. The plaintiffs deny this asseveration but offer no record support.

so he pushed Harvey away. The plaintiffs assert that Emery responded to her by saying "shut the f* * * up and go home," (Harvey Dep. at 10–11; Moss Dep. at 15–16), and that Emery told Harvey that she was a "nigger bitch" and she needed to take her ass back home because she had nothing to do with him. Emery denies these allegations stating that he never swore at Harvey or told any of the plaintiffs to "get the F out" of there. (Emery Dep. at 26–27.) There is no dispute that Harvey next said: "F* * * you. This is America and I can stand and say and do whatever I please."

After this exchange Harvey again asked why Hardy was being arrested. Plaintiffs assert that Emery responded to her intervention by telling her to get her ass home or face going with Hardy. (Harvey Dep. at 12.) She states that after Hardy encouraged her to go home Harvey began to conform to Emery's demands and began to leave the scene. (Harvey Dep. at 13.) However, the plaintiffs contend, after two other individuals commented that Hardy's arrest was not right, Emery yelled at Harvey, "didn't I tell you to shut the f* * * up and go the f* * * home." (*Id.* at 14.)

Emery proceeded to arrest Harvey. Harvey admits that she tussled with Emery and refused arrest. Moss witnessed Harvey being handcuffed and saw that Harvey was resisting. The plaintiffs state that when Emery was arresting Harvey she asked why she was being arrested and Emery told her: "I told your bitch ass to shut up." (*Id.*) And, as Harvey attempted to speak with Hardy, who was sitting in the cruiser, Emery threw her onto the top of the cruiser. (*Id.* at 15; Moss Dep at 17–18.) They also allege that even though it was a very hot afternoon, Emery turned the cruiser off, shutting off the air conditioner, and he refused to open the windows

or provide Harvey with an asthma inhaler. (Harvey Dep at 16–18.)

With respect to this description of the Emery/Harvey interaction, Emery contends that he gave Harvey a disorderly conduct warning and never used foul language. (Emery Dep. at 26–27.) He states that she did not comply and so he was forced to arrest her and place her in the cruiser. (Emery Aff. ¶ 6.) Emery asserts that he did not use force during any of the arrests beyond what was necessary to put the handcuffs on and place the arrestees in the cruiser. (Emery Aff. ¶ 10.) According to Emery, as Emery was putting Hardy in the cruiser Harvey continued to scream and was unruly, with Hardy stating that she would not be arrested if she were white; Emery informed Harvey that this was not the case and told her she must quiet down or be taken to jail. (Emery Aff. ¶ 6.) He alleges that Moss became madder after the Harvey arrest and told him (when Emery said to shut up and go home), "as long as I've known this is a free state," and "We can say whatever we want to say as long as we are not threatening anyone." (DSMF ¶ 55; Moss Dep. at 14–15.) Emery acknowledges that Harvey and Hardy complained about the temperature of the car but he claims he had not turned the car off and so he did not do anything further because the air conditioner was on. (Emery Dep. at 25–26.) The parties agree that after Emery got Harvey into the cruiser he called dispatch and asked that another officer be sent to assist him.

The plaintiffs assert that as Harvey and Hardy were sitting in the cruiser Schoenig taunted them by swearing and stating, "that's what you bitches get." (Harvey Dep. at 20.) Emery took no action to prevent these offensive insults. (*Id.*) When Moss remarked to two other individuals that the arrest did not make any

sense, Emery approached the three women and told them, you "need to shut the f* * * up and get your asses home" and indicated that the alternative would be arrest. (Moss Dep. at 19.) [9]

With regards to the Moss arrest, the plaintiffs assert that as Moss was trying to leave the area a white woman approached her and told her she was going to "whoop Ms. Moss's ass." (Moss Aff. ¶ 20; Moss Dep. at 19.) The parties agree that Moss started "fussing" with another tenant, exchanging threats about "kicking each other's asses." With respect to Emery's approach to this scene, Moss describes how Emery ignored the white woman's threats, ran past the white woman, and arrested Moss who had verbally responded to the threat. (Moss. Dep. at 20.) Emery said to Moss, "Didn't I tell you to shut the f* * * up and carry your ass into the house." (Moss Dep. at 20.) [10] He then pulled one of Moss's arms up behind her back so far that she could almost touch her neck and dragged her to the cruiser. (Id. at 20–21.) When Moss complained of the pain Emery loudly replied, "if you walked more like a human instead of an animal, it wouldn't hurt so bad." (Id. at 20, 22.) [11] Moss's arm was sore for over a week. (Id. at 24.)

Emery's rendition of the Moss arrest is different. He states that one of the tenants advised him that he needed to go to the back of the apartment complex because there was trouble there. (Emery Aff. ¶ 7.) [12] He says that he found Moss in the back of the apartment having a verbal confrontation with a group of four to six white neighbors. (Emery Dep. at 27–28.) The white residents confirmed to Emery what he was seeing: Moss was screaming and hollering at them. (Id. at 28.) He believes the neighbors were screaming back. (Id.) He states that he went up to her and informed her that she was under arrest for disorderly conduct. (Id. at 34.) Then he used a hold that he generally uses to control a disruptive prisoner, a procedure that involved pulling her right arm to the middle of her back. (Id.) Moss resisted; twice she tried to pull away. (Id.) Emery had to move the arm up to inflict some discomfort until he got Moss into the cruiser. (Id. at 34–35.) He acknowledges that Moss told him that he was hurting her. (Id. at 35.) He states that Moss refused to walk and, because she was a large woman, Emery was having difficulty overcoming her resistance. (Emery Aff. ¶ 11.) Moss told Emery that she was being treated like "an animal" to which Emery responded that if she would simply walk like a human being he would not have to treat her in a manner she found objectionable. (Id.) He did not mean to derogate her race. (Id.) Regarding Moss's contention that her arm was sore for a week, Emery asserts that the maneuver he used would only cause momentary discomfort. (Emery Dep. at 34–35.)

There is no dispute that Emery then placed Moss in his vehicle and transported

9. In response to this description Emery cites to the nonexistent page 37 of his deposition. Apparently Emery requested that the plaintiffs submit the full deposition transcript (Resp. SMF ¶ 13) but it has not been filed to this date.

10. Emery denies this allegation but the record reference (Emery Dep. at 32) does not contravene the assertion.

11. Emery states that "the context of that statement does not appear in the allegations of the complaint." (DSMF ¶ 77) Certainly the plaintiffs are not required to plead their cause with such specificity under Federal Rule of Civil Procedure 8. *See Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 512–13, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

12. Plaintiffs assert this is hearsay. *See supra* footnote 7.

the three plaintiffs to the police station. The three women advised him that they did not have money for bail. As a consequence they were bailed without any fees so that they could return home to their children. The plaintiffs were given statement forms so that they could describe their version of the events preceding Emery's arrival on the scene but they did not submit these forms.[13]

Finally, Emery offers a series of statements that attempt to establish his good intentions on the afternoon in question, all of which the plaintiffs contend are belied by their version of events. He asserts that it was the plaintiffs' conduct at the scene that prevented him from interviewing them at the time about the events that occurred prior to his arrival. (Emery Aff. ¶ 8.) He perceived that the plaintiffs were determined by their conduct to prevent Emery from interviewing anyone else. (*Id.*) It was this conduct that gave rise to the disorderly conduct warnings and the subsequent arrests. (*Id.*) He avers that the race of the plaintiffs was not a factor in his decision to make the arrests and that, having not witnessed the underlying events, he would not have taken sides in a neighborhood dispute. (*Id.* at ¶ 9.) He attests that he harbors no racial animosity toward any of the women he arrested. (*Id.*) With respect to the force used, he asserts that he did not use force during any of the arrests beyond what was necessary to put the handcuffs on and place the arrestees in the cruiser and that not one of the plaintiffs complained about the physical force or injuries. (Emery Aff. ¶ 10.)

He felt that the atmosphere at the apartments was "highly charged and emotional," that things were escalating, and he needed to separate the two groups immediately. (*Id.* ¶¶ 10, 12) He was concerned that there was a potential for escalation into a physical confrontation involving both adults and children. (*Id.*)[14] It was the screaming and yelling of the plaintiffs, including their use of much profanity in front of children, that triggered Emery's decisions to interview one man in his cruiser and another woman in her apartment. (*Id.* at ¶ 12.) He insists that he never used racial slurs during the incident. (*Id.*)

### *Discussion*

**A. Viability of the Plaintiffs' Section 1983 and Section 1981 Equal Protection Claims**

The plaintiffs bring this suit pursuant to sections 1983 and 1981 of title 42 of the United States Code. Section 1983, captioned "Civil action for deprivation of rights," provides as relevant:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983. Entitled "Statement of equal rights," section 1981 provides:

---

13. The plaintiffs explain that they did not complete these forms because they have been charged with a crime.

14. With respect to this assertion, the plaintiffs note that Emery acknowledges that the plaintiffs did not use language that incited violence. (Emery Dep. at 19–20.) Once again,

the parties have failed to provide a portion of the Emery deposition on which they rely, here page 20 of the Emery deposition which contains the response to a question that begins, "Was there any language that the black women were using that was likely to incite someone to become...." (Emery Dep. at 19.)

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981. Thus, the plaintiffs assert that both their constitutional and federal statutory rights were violated.

Though in his memorandum for summary judgment Emery paints the plaintiffs plaint as turning on whether Emery arrested them without probable cause, it is clear that the plaintiffs are not arguing that there was no probable cause to arrest them under Maine law. Rather, they assert that Emery, as a State actor, enforced the laws selectively based on their race in conducting his investigation of the complaint and when he made his decision to arrest them.

The First Circuit in *Alexis v. McDonald's Restaurants of Massachusetts, Inc.*, 67 F.3d 341 (1st Cir.1995) allowed that "a misuse of governmental power motivated by racial animus comes squarely within the 'equal benefit' and 'like punishment' clauses of section 1981(a)." 67 F.3d at 348. And, with respect to their Fourteenth Amendment Equal Protection Clause section 1983 claim the plaintiffs have "to tender competent evidence that a state actor intentionally discriminated against [them] because [they] belonged to a protected class." *Alexis*, 67 F.3d at 354 (1st Cir.1995) (citing *Johnson v. Morel*, 876 F.2d 477, 479 (5th Cir.1989) [15]).

I view this dispute through the *Alexis* prism. The Equal Protection claim in that case involved an incident in which a defendant—a uniformed, off-duty officer—was asked by a McDonald's manager to assure that the plaintiffs, an African American family, left the restaurant because they were "creating a scene" over a mix-up with their food order. 67 F.3d at 345. The officer made no further inquiry into the " 'disturbance' " beyond listening to these representations and informed the family that the manager wanted them to go and that they would have to leave. *Id.* Yvonne Alexis asked why they needed to leave, insisted that they had not caused a disturbance, protested that they had a right to stay, and asked the officer if he would ask other McDonald's patrons whether they had caused any disturbance. *Id.* at 345–46. The officer then relayed his conversation to the McDonald's managers, indicating that the plaintiffs refused to leave. *Id.* at 346. In front of the officer the two managers discussed how there had been a " 'problem' " with the plaintiffs on an earlier occasion and the two agreed that they should be made to leave. *Id.* The officer then returned to the Alexis family and advised Yvonne Alexis that she would be arrested if she did not leave before his back-up arrived. *Id.* Alexis indicated that she believed she had a right to stay. At which juncture the officer summoned back-up. *Id.*

**15.** The Fifth Circuit recognized the abrogation of *Johnson* on other grounds in *Harper v. Harris County*, 21 F.3d 597, 600 (5th Cir. 1994) ("The Supreme Court overruled the significant injury prong in an Eighth Amendment excessive use of force context. *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). We now hold that the *Johnson* standard is no longer valid in the wake of *Hudson v. McMillian*, 503 U.S. 1, 12, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), to assess whether plaintiff has alleged a constitutional violation. A plaintiff is no longer required to prove significant injury to assert a section 1983 Fourth Amendment excessive force claim.").

Ten minutes later, the defendant officer, accompanied by his back-up, informed Yvonne Alexis that she was being placed under arrest. *Id.* The Court summarized the officer defendant's actions as follows:

Then, without asking or directing Alexis to get up from the table, [the defendant] suddenly and violently grabbed and pulled her bodily from the booth and across the table, handcuffed her hands tightly behind her back, and, with the help of [his back-up], dragged her from the booth, bruising her legs in the process. Insisting that she was "not resisting arrest," Alexis asked the officers to allow her to walk out. Instead, they hoisted her by her elbows and carried her from the restaurant to the police car, where [the defendant] pushed her into the car with the instruction, "Get your ass in there."

As she was being removed from the restaurant, Alexis and her husband repeatedly asked the officers why she was being treated in this manner. When Mr. Alexis said, "We have rights," [the defendant] responded, "You people have no rights. You better shut up your [expletive] mouth before I arrest you too."

*Id.*

Base on these facts the Court reflected with respect to the § 1981 claims:

During the arrest, [the defendant] stated to Mr. Alexis: "You people have no rights. You better shut up your . . . mouth before I arrest you too." Alexis insists that this statement betrayed a racial animus. [The defendant] responds that the statement—"You people have no rights"—is too general to support the section 1981(a) claim. Given its context, we cannot agree.

A rational factfinder who credited this statement, as we must at summary judgment, . . . reasonably could infer that

[the defendant] harbored a racial animus adequate to support a section 1981 claim, especially since the record reflects that the *only* relevant behavior or physical characteristic—both *apparent* to [the defendant] and *shared* by the Alexis family—was their black skin. Indeed, a rational factfinder would be hard-pressed to glean a more plausible inference, particularly since [the defendant] has tendered no alternative interpretation supported by the present record. Viewed in context, therefore, the [defendant's] statement, tarring the entire family with the same brush—absent a scintilla of evidence that any member, with the possible exception of Alexis, had said or done anything remotely wrong or disorderly—cannot reasonably be *presumed so innocent as to preclude* a discriminatory animus.

*Id.* (footnote omitted). The Court reversed summary judgment on the section 1981 count, viewing the record as supporting a reasonable inference that the defendant's gratuitous employment of excessive force was motivated by racial animus and thus "violative of the 'equal benefit' and 'like punishment' clauses of section 1981(a)." *Id.*

With respect to their section 1983 claim premised on the Equal Protection clause of the Fourteenth Amendment, the First Circuit reasoned:

A rational factfinder, who credited Alexis's evidence of racial animus and excessive force, could conclude that [the defendant] resolved, on the basis of her race, to enforce the criminal trespass statute by effecting an immediate seizure of her person. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373–74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) ("[I]f [the law] is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make

unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution."); *Johnson [v. Morel]*, 876 F.2d [477,] 479 [ (5th Cir.1989) ](plaintiff stated viable Equal Protection Clause claim, where officer humiliated and harassed plaintiff prior to and during *lawful* arrest on basis of plaintiff's race); *United States v. Scopo*, 19 F.3d 777, 786 (2d Cir.) ("Though the Fourth Amendment permits a pretext arrest, if otherwise supported by probable cause, the Equal Protection Clause still imposes restraint on impermissibly class-based discriminations.") (Newman, C.J., concurring), *cert. denied*, 513 U.S. 877, 115 S.Ct. 207, 130 L.Ed.2d 136 (1994); *Inada v. Sullivan*, 523 F.2d 485, 489 (7th Cir.1975) (finding right of action under Equal Protection Clause where police officer, motivated by animus toward plaintiff's ancestry, threatened him with deportation); *Tanner v. Heise*, 879 F.2d 572, 580 n. 5 (9th Cir.1989) (where plaintiff alleged "equal protection" violation, police officers' "mere compliance" with state law would not shield them from liability under § 1983, provided plaintiff could prove that officers' motivation for arrest was to harass plaintiff because of his religious beliefs). Furthermore, a rational factfinder could conclude that, in electing to use excessive force to effect the violent seizure of Alexis's person and her forcible removal from the restaurant, [the defendant] was motivated by a discriminatory animus. *See Smith v. Fontana*, 818 F.2d 1411, 1420 (9th Cir.) (finding actionable claim where it was alleged that decedent had been subdued through use of excessive force because he was black), *cert. de-*

*nied*, 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987). We therefore hold, based on the present record, that the Equal Protection Clause claims under section 1983 are trialworthy.

*Id.* at 354.[16] *See also Flowers v. Fiore*, 239 F. Supp 2d. 173, 178 (D.R.I.2003) (observing that allegations of selective enforcement of motor vehicle laws based on race presented a cognizable § 1983 Equal Protection claim, and noting that the plaintiff must generate evidence "that he was treated differently from similarly situated white motorists and that the action taken against him was motivated, at least in part, by his race").

I cannot but conclude in view of *Alexis* that the plaintiffs section 1981 and section 1983 claims survive this motion for summary judgment. There are genuine disputes of facts in this case that go directly to the heart of the plaintiffs' "equal benefit"/"like punishment" and Fourteenth Amendment Equal Protection claims. The plaintiffs have generated facts bolstered by record support with regard to Emery's actions such as: he used the term "nigger bitch" and other gratuitously foul language repeatedly when interacting with the plaintiffs; he insinuated that Moss was "an animal" and/or not walking like a human; he allowed Schoenig to taunt the plaintiffs while they were in Emery's custody; he ignored the threatening language of the white individuals involved in the neighborhood fray while pursuing the plaintiffs for their verbal sparring; he repeatedly ignored the plaintiffs' attempts to get him to listen to their version of events even when they confronted him with their feelings that he was ignoring them because of their race; he chose to credit the accounts of

---

**16.** Emery relies on *Buffkins v. City of Omaha*, 922 F.2d 465, 468 (8th Cir.1990). The discussion in this case of the equal protection concern is minimal and I find its facts inapposite. *Compare id.* at 468 with *id.* at 468 n. 8.

the white male and Schoenig without investigating the accounts of the plaintiffs; he left Hardy and Harvey in a sweltering car without the air-condition on; he did not caution or arrest any of the many whites involved in the neighborhood dispute who were also engaged in verbal combat during Emery's presence but elected to caution and arrest [17] three African Americans; [18] and he used force during the three arrests that, though not brutal by any accounts, was excessive in relation to the plaintiffs' resistance. Confronted with such facts a jury could find evidence that Emery harbored a racial animus toward these plaintiffs adequate to support the sections 1981 and 1983 claims under *Alexis*.

Of course, Emery disputes these facts and the characterization of his motivations, but here I must draw all reasonable inferences in the plaintiffs' favor. All I have before me are the competing depositions and affidavits of the four parties. This case is rife with disputes about what was said and done that are ultimately resolvable by a trier of fact charged with making the credibility determinations.

### B. Viability of Emery's Assertion of Qualified Immunity

Emery makes a rather indecisive argument that he is entitled to qualified immunity at this phase of the litigation. (Mot. Summ. J. at 8, 11–12; *see also* Answer at 4.) The First Circuit applies a three-part test when making the qualified immunity determination. *Suboh v. Dist. Atty's Office Suffolk Dist.*, 298 F.3d 81, 90 (1st Cir.2002) "The threshold inquiry," I have made above: "whether the plaintiff's allegations, if true, establish a constitutional violation." *Id.* I have concluded that the allegations "if true" establish a constitutional violation. "The second question," with respect to qualified immunity, "is whether the right was clearly established at the time of the alleged violation." *Id.* In view of *Alexis*, a decision that issued in 1995, Emery was "on notice" that his conduct was unlawful at the time of the August 2001 arrests. *Suboh*, 298 F.3d at 90. The *Alexis* facts are "not distinguishable in a fair way from the facts presented in the case at hand." *Saucier v. Katz*, 533 U.S. 194, 202–03, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

Third, I ask as a legal question: "whether a reasonable officer, similarly situated, [to Emery] would understand that the challenged conduct violated that established right." *Id.; see also id.* ("The reasonableness inquiry is also a legal determination, although it may entail preliminary factual determinations if there are disputed material facts (which should be left for a jury).").  In view of the close similarities between this case and the clearly established law of *Alexis* I conclude that a reasonable officer in Emery's position would understand that his conduct, if

---

**17.** In his memorandum Emery emphasizes that he can establish probable cause for the arrest under Maine law. Though this may be relevant to the inquiry, this in not determinative of the plaintiffs' Equal Protection claims. *See, e.g., United States v. Scopo*, 19 F.3d 777, 786 (2d Cir.1994) ("Though the Fourth Amendment permits a pretext arrest, if otherwise supported by probable cause, the Equal Protection Clause still imposes restraint on impermissibly class-based discriminations.") (Newman, C.J., concurring); *Tanner v. Heise*, 879 F.2d 572, 580 n. 5 (9th Cir.1989) (where plaintiff alleged an "equal protection" violation, police officers' "mere compliance" with state law would not shield them from liability under § 1983, provided plaintiff could prove that officers' motivation for arrest was to harass plaintiff because of his religious beliefs); *see also Alexis*, 67 F.3d at 354 (citing Judge Newman's *Scopo* concurrence and *Tanner*).

**18.** *See Alexis* 67 F.3d at 354 n. 13.

proven to be as the plaintiffs assert, violated their rights to Equal Protection under sections 1981 and 1983.

### Conclusion

For these reasons I **DENY** Emery's motion for summary judgment.

*So Ordered.*